UNITED STATES of America, Appellee,
v.
Victor Jacob SENI, Appellant.

UNITED STATES of America, Appellee,
v.
Bobby Lee MINTON, Appellant.

UNITED STATES of America, Appellee,
v.
Samuel Ellis FERGUSON, Appellant.

UNITED STATES of America, Appellee,
v.
Hector MORALES, Appellant.

UNITED STATES of America, Appellee,
v.
Carlos FIUSA, Appellant.

UNITED STATES of America, Appellee,
v.
Pablo Raul ALONSO, Appellant.

Nos. 81–5006 to 81–5011.

United States Court of Appeals,
Fourth Circuit.

Argued June 5, 1981.

Decided Oct. 26, 1981.

Rehearing Denied Dec. 14, 1981.

Certiorari Denied Feb. 22, 1982.
See 102 S.Ct. 1453.

Irvin B. Tucker, Jr., Raleigh, N.C., Paul Morris, Miami, Fla. (William A. Clay, Miami, Fla., Oscar Rodriguez, Coral Gables, Fla., on brief), for appellants.

Patricia L. Holland, Asst. U. S. Atty., Raleigh, N.C. (James L. Blackburn, U. S. Atty., Raleigh, N.C., Richard Tatum Gammon, Third Year Law Student on brief), for appellee.

Before PHILLIPS and MURNAGHAN, Circuit Judges, and Williams *, District Judge.

MURNAGHAN, Circuit Judge:

In the early morning of July 9, 1979, law enforcement officers converged on the Queen Elizabeth, a shrimping trawler docked at the Oak Island Marina in Brunswick County, North Carolina. On board the officers found 15 tons of marijuana, apparently in the process of being unloaded. Finding no one in the immediate vicinity, the officers set up a roadblock on Highway 133 about 5 miles from the marina. Defendant Ferguson was arrested at about 1:40 a. m. as he approached the roadblock in a large van. Defendant Minton was arrested about half an hour later as he approached the roadblock in another van.

Officers at the marina began a thorough search of the area. At about 6:30 a. m., they found defendants Seni and Morales hiding in clumps of bushes. Under questioning, Seni told the officers that he and others involved had been staying at a motel in Wilmington, North Carolina. The motel was placed under surveillance. Defendants Alonso and Fiuza were arrested as they returned to the motel that evening.

Those six defendants, and a seventh defendant, Henderson, were charged with conspiracy to import marijuana and conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 952(a), 960(a)(1), 963, 841(a)(1) and 18 U.S.C. § 2 (count I); unlawful importation of marijuana in violation of 21 U.S.C.

§§ 952(a), 960(a)(1) and 18 U.S.C. § 2 (count II); and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The six defendants were convicted on all counts. A mistrial was declared with regard to Henderson.

As anyone compelled by the nature of his work frequently to review drug convictions knows, a plethora of ingenious defenses followed the indictments. To clear the decks for consideration of several serious contentions involving rather close questions, we first dispose of the easier ones.

## I.

*Adequacy of Jury Instructions. a. Instruction on Importation.* Assuming that importation of the marijuana has been proven (a disputed issue which we later address), nevertheless the defendants argue that the district court incorrectly instructed the jury concerning importation. They argue that the court's instruction incorrectly gave the impression that the jury could convict the defendants of importation if the jury found no more than that the marijuana had, at some previous time, been imported, rather than making clear that a finding was necessary that the defendants themselves imported it.

The argument is without merit. Unquestionably the prosecution must prove that the defendants imported the marijuana; proof simply that the marijuana was imported is insufficient. *See, e. g., United States v. Moler*, 460 F.2d 1273 (9th Cir. 1972). Considered as a whole, however, the court's instruction plainly requires the jury to find that the defendants imported the marijuana. The court instructed the jury that the prosecution must prove three elements to establish importation: (1) the marijuana was in fact imported, (2) the importation was done knowingly and willfully, and (3) the defendant willfully associated himself with the venture. The defend-

---

* The Honorable Richard L. Williams, United States District Judge for the Eastern District of Virginia, sitting by designation.

ants' argument makes sense only if the first element is read separately from the second and third. But the third element clearly refers to the first—each defendant must have willfully associated himself with a venture to import marijuana.

■ b. *Instructions on the Objects of the Conspiracy.* The trial court instructed the jury that it could convict a defendant of conspiracy if it found that the defendant had conspired with any other person "to commit an offense against the United States in violation of the general laws relating to marijuana." The defendants argue that the general nature of the instruction on conspiracy required the court to give adequate instructions on the objects of the conspiracy, importation and possession with intent to distribute. They argue that the court did not give adequate instructions on the objects of the conspiracy, thereby requiring a new trial under *U. S. v. Head*, 641 F.2d 174 (4th Cir. 1981).

The argument fails for two reasons. First, a review of the record shows that the court specifically instructed the jury on the objects of the conspiracy at several points in the instructions. Second, the defendants' reliance on *Head* is misplaced. The trial court in *Head* instructed the jury that to convict the defendant of conspiracy, the jury did not have to find that the defendant conspired to violate all three substantive counts, but did have to find that the defendant conspired to violate at least one of the substantive counts. The appellate court recognized that the acts alleged in two of the substantive counts occurred largely at a time outside the statute of limitations period. The court ordered a new trial because it could not determine from the general verdict or the general nature of the conspiracy instructions the counts on which the defendant had been convicted. No problem even remotely similar to *Head* exists here. The court's instructions on conspiracy, importation, and possession with intent to distribute were proper.

## II.

*Admissibility of Seni's Statements to Police Officers.* Seni was discovered when one of the officers saw his leg protruding from a clump of bushes at the marina. The officer drew his gun, identified himself as a police officer, and ordered Seni to come out with his hands on his head. Seni was arrested, handcuffed, and read his rights. Seni said that he understood his rights. He then told the officer that he "did it" because the money was good and fast. Seni was placed in the back of a police car, advised of his rights again, and interrogated. Seni told the officers that he and several other people had been unloading the marijuana when the police arrived, and that they ran and hid. Seni also said that he had become involved in the operation in Miami, and that someone he did not know had paid for room 259 and an adjacent room at the Rodeway Inn in Wilmington, where he and others involved had been staying.[1]

a. *Voluntariness of the Statements.* Seni argues that his statement that he "did it" should have been suppressed at trial because it was involuntary, and that his subsequent statements should have been suppressed as fruit of the first statement. Seni argues that his first statement was involuntary because the officer had handcuffed him and was pointing a gun at him at close range when he made the statement.

■ Seni's argument is without merit. Neither a drawn gun, *see United States v. Wertz*, 625 F.2d 1128, 1137 (4th Cir. 1980), *cert. denied*, 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1981), nor handcuffs, *see United States v. Ogden*, 572 F.2d 501, 503 (5th Cir. 1978), *cert. denied*, 439 U.S. 979, 99 S.Ct. 564, 58 L.Ed.2d 650 (1978), establish involuntariness in and of themselves. An incriminating statement is involuntary only if induced by such duress or coercion that the suspect's "will has been overborne and

---

1. Seni could not remember the name of the motel, but the officers identified the motel from a matchbook in Seni's pocket. Apparently Seni did remember the number of his room, 259, and told the officers that others involved had been staying in the adjacent room. It is uncertain from the record whether Seni mentioned the adjacent room 257 by number.

his capacity for self-determination critically impaired," *United States v. Wertz*, 625 F.2d at 1133, quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973). Involuntariness is a question of fact to be determined from "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *United States v. Wertz*, 625 F.2d at 1133–34, quoting *Schneckloth v. Bustamonte*, 412 U.S. at 226, 93 S.Ct. at 2047.

■ The totality of the circumstances supports the trial court's conclusion that the statement was voluntary. Seni had been read his rights moments before, and said that he understood them.[2] Seni did not make the statement in response to a question, but simply offered it. He does not allege that a lack of education, maturity, or intelligence deprived him of the ability to choose to remain silent.

■ b. *Admissibility against Other Defendants.* The other defendants argue that Seni's statements implicating others in a conspiracy were admitted in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* held that admission of a nontestifying defendant's confession which incriminates codefendants violates the codefendants' right to cross-examination. Subsequent to *Bruton*, however, numerous courts have held that a defendant's confession may be admitted at a joint trial if references to the identity of codefendants are redacted. *See United States v. Belle*, 593 F.2d 487, 493 (3d Cir. 1979), *cert. denied*, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979) and cases cited therein. The trial court here carefully redacted all references that would identify the other participants in the conspiracy, and

cautioned the jury that it was to consider the statements only against Seni. No violation of the *Bruton* rule occurred.

### III.

■ *Stop, Frisk and Arrest of Alonso and Fiuza.* After Seni revealed that he and others involved had been staying in room 259 and an adjacent room of the Rodeway Inn in Wilmington, the rooms were placed under surveillance while the officers sought a search warrant. At about 6:40 on the evening of the day Seni was arrested, the officer watching the rooms saw Alonso and Fiuza walk across the motel lawn to the motel office. Alonso entered the office, came out, and handed Fiuza what appeared to be a room key. Alonso and Fiuza walked to room 257; Fiuza went inside for about two minutes while Alonso waited outside. As Alonso and Fiuza walked back across the parking lot, the officer approached them with his gun drawn, stopped them, and identified himself. The officer noticed that Alonso and Fiuza had mud on their pants and scratches on their arms. The officer asked Alonso and Fiuza for identification. Both produced Florida drivers' licenses. The officer then told Alonso and Fiuza to walk over to the officer's truck, and to lean against the truck so that the officer could frisk for weapons. As the officer conducted the frisk, Fiuza dropped the key to room 257 into the bed of the truck. The officer detained Alonso and Fiuza until a back-up unit arrived. Alonso and Fiuza were then arrested.

Alonso and Fiuza argue that because the officer approached them with his gun drawn, required them to walk over to his truck, and frisked them, the initial stop constituted an arrest without probable cause. They also argue that, even if the

---

**2.** Citing *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), Seni argues that the fact that he had been read his rights does not establish voluntariness. *Dunaway* and *Brown*, however, state that the fact that a suspect has been read his rights does not attenuate the taint between an illegal arrest and a subsequent confession or consent to a search. *Dunaway* and

*Brown* are based on the rationale that the exclusionary rule serves interests and policies under the Fourth Amendment that are distinct from the policies it serves under the Fifth Amendment. *See* 442 U.S. at 217, 99 S.Ct. at 2258; 422 U.S. at 601, 95 S.Ct. at 2260. Whether a suspect has been read his rights remains a circumstance to be considered in determining voluntariness for Fifth Amendment purposes.

initial stop was no more than a *Terry* stop, the officer had no reasonable suspicion of criminal activity. Alonso and Fiuza argue that under either a probable cause or a reasonable suspicion standard, the evidence developed subsequent to the stop should have been suppressed at trial.[3]

We find nothing improper about the stop, frisk, and arrest of Alonso and Fiuza. The fact that the officer drew his gun and frisked Alonso and Fiuza for weapons does not necessarily elevate the stop into an arrest. Courts have held that an officer may draw his gun and conduct a frisk when justified as a reasonable precaution for protection and safety. *See, e. g., United States v. Thompson,* 558 F.2d 522 (9th Cir. 1977), *cert. denied,* 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978); *United States v. Worthington,* 544 F.2d 1275, 1280 n.3 (5th Cir. 1977), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977) (based upon experience with drug traffickers, agents reasonably feared death or serious injury when they stopped plane on dark, deserted airstrip). Under the circumstances here, drawing the gun was a reasonable safety precaution, and the stop, therefore, was valid under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), if the officer had a reasonable suspicion of criminal activity.

Alonso and Fiuza argue that their arrival at room 257, more than 50 miles from the marina and more than 18 hours after the police converged on the Queen Elizabeth, does not establish a reasonable suspicion of criminal activity. It is important to note, however, what is at issue here. This is not a situation in which a police officer sees suspicious activity that may or may not involve a crime, and detains a suspect briefly to determine whether a crime occurred. The officer here knew that a crime had

occurred. The question is whether the officer could reasonably suspect that Alonso and Fiuza were participants in the crime simply because Fiuza entered room 257 while Alonso waited outside. We think the officer's suspicions were reasonable. The officer had reliable information from a participant in the crime[4] that other persons involved had been staying in room 259 and an adjacent room of the Rodeway Inn. A check with the motel office earlier in the day revealed that the same person had rented both rooms from July 7 through 12 noon on July 9. The rooms had not been rerented, and had been under surveillance since early that morning. From this information the officer could reasonably suspect that anyone entering the rooms may have been a participant in the crime, and could detain the person briefly to resolve his suspicion. After stopping Alonso and Fiuza, the officer saw the mud on their pants and scratches on their arms. Their appearance, in conjunction with Fiuza's attempt to discard the room key, tended to confirm their identities as participants, and provided probable cause to arrest.

We now have arrived at the three hardest questions raised.

## IV.

■ *Sufficiency of the Evidence of Conspiracy.* Each defendant argues that the evidence was insufficient to link him to the conspiracy. The arguments of Seni, Morales, Alonso, and Fiuza are predicated in part on their related challenges that some evidence against them should have been suppressed.[5] Because the evidence was properly admitted, there was sufficient evidence from which the jury could find each defendant guilty beyond a reasonable doubt.[6]

---

3. The evidence consisted of marijuana residue on their clothes, and their fingerprints, which matched prints at the marina.

4. Participation in a crime establishes reliability of information for purposes of a search warrant. *See, e. g., United States v. Dunloy,* 584 F.2d 6, 10 (5th Cir. 1978).

5. *See* II, III, *supra.*

6. Seni and Morales were found hiding in bushes at the marina. Fibers were found on Seni's and Morales' clothes that were consistent with the burlap wrapped around the bales of marijuana. Seni's fingerprints were found on one of the cars at the marina. Seni also made numerous incriminating statements. Al-

 Ferguson and Minton have a stronger argument. The evidence against them was as follows: After the police discovered the Queen Elizabeth at the Oak Island Marina, with 15 tons of marijuana partially unloaded, they set up a roadblock late at night approximately 5 miles west of the marina on Highway 133. The roadblock was set up about 100 yards east of the intersection of Highways 211 and 133, *i. e.*, in the direction towards the marina. A short time later, at about 1:40 a. m., a 2½ ton van-type truck, similar to trucks into which offloading had been taking place at the marina, traveling north on 211, pulled into a service station located at the intersection, and proceeded across the station parking lot toward Highway 133. The truck stopped when its lights revealed the roadblock. An officer approached the truck, and talked to the driver, defendant Ferguson. Ferguson told the officer he was heading to Southport to pick up produce. Moments later, he told another officer he was heading to Southport to help a friend move, but did not know the friend's name or where he was to meet the friend. A consent search revealed about a "handful" of marijuana residue in the back of the truck.

About one-half hour later, a second 2½ ton van-type truck, driven by Minton, pulled from Highway 211 onto Highway 133 and stopped at the roadblock. Minton told officers he was on his way to Southport to pick up mattresses, but did not know the name of the mattress company. A search of the truck revealed marijuana traces on the floor and on the braces halfway up the side of the truck.

No other evidence was introduced to link Ferguson and Minton to the conspiracy. Their fingerprints were not found at the marina, and they were not linked in any

other way to any of the other conspirators. Although the evidence against them is not overwhelming, the contention that it is insufficient rapidly loses its surface plausibility when pertinent additional details are taken into account:

A. Ferguson and Minton were stopped at the intersection of Highways 133 and 211 at the very time when persons would be expected to show up at the marina to take delivery of marijuana.

B. Highway 133 led to few, if any, destinations other than the marina itself in the 5-mile stretch between the intersection and the marina.

C. Ferguson had committed himself to turn into a closed service station at the intersection of Highways 211 and 133 before coming to a halt in consequence of the roadblock. Minton had also turned from Highway 211 onto Highway 133.

D. Both proclaimed their destinations to be Southport, but that objective could be reached only by following Highway 211 north. Highway 133 did not lead to Southport.

E. Each of them gave explanations of what he would be seeking to accomplish in Southport which lay somewhere between the highly implausible and the flagrantly false.

F. The marijuana residues located in their vans (which in each case was of a size and design consistent with two other trucks located at the marina and engaged or awaiting engagement in the transportation) fitted well with a conclusion that the trucks had recently been loaded with marijuana, driven to a destination, unloaded, and were returning for another load.

In short the evidence was sufficient to sustain conviction of Minton and Ferguson.[7]

---

onso and Fiuza were arrested at the Rodeway Inn where participants had been staying. They had mud on their pants, scratches on their arms, and marijuana residue was found on their clothes. Alonso's fingerprints were found on a can in the galley of the Queen Elizabeth, and Fiuza's fingerprints were found on three

vehicles seized at the marina. The evidence was sufficient to convict each.

7. Ferguson and Minton argue that the evidence against them is comparable to the evidence in *United States v. Palacios*, 556 F.2d 1359 (5th Cir. 1977) and *United States v. Stroupe*, 538 F.2d 1063 (4th Cir. 1976), in which conspiracy convictions were reversed. In neither *Palacios*

## V.

 *Rejected Request for Instruction as to the Lesser Included Offense of Possession.* At trial, each defendant requested an instruction on the lesser included offense of possession of marijuana. Certainly for defendants Seni, Morales, Alonso, and Fiuza the reed is slender and frail. An instruction on a lesser included offense is proper when the greater offense requires the jury to resolve a disputed factual element which is not required for conviction of the lesser included offenses. *See United States v. Rogers,* 504 F.2d 1079 (5th Cir. 1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2655, 45 L.Ed.2d 693 (1975). If Seni, Morales, Alonso, and Fiuza were guilty of possession, it was possession of the 15 tons of marijuana. That amount of marijuana is sufficient to establish intent to distribute. *See, e. g., United States v. Laughman,* 618 F.2d 1067, 1074 n.7 (4th Cir. 1980), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). The jury reasonably could not find the defendants guilty of possession without also finding them guilty, in view of the large quantity of marijuana, of possession with intent to distribute. No instruction on the lesser included offense of possession was required. *See United States v. Henley,* 502 F.2d 585, 586 (5th Cir. 1974) (possession of seven tons of marijuana justified trial court's refusal to instruct jury on lesser included offense of simple possession).

 Ferguson and Minton make a facially appealing argument that they were entitled to an instruction on possession because the jury could have found them guilty of possessing the small amounts of marijuana in the back of each truck without also finding that they were part of the conspiracy. On reflection, however, it appears that Ferguson and Minton confuse a lesser included offense with a separate offense. Ferguson and Minton were charged with possession of the 15 tons of marijuana at the marina with intent to distribute. The marijuana in the back of each truck was part of the evidence linking them to the 15 tons of marijuana. If the evidence established the link, Ferguson and Minton were no more entitled than any of the other defendants to an instruction on a lesser included offense. The jury could not reasonably find that they possessed the 15 tons of marijuana without also finding that they intended to distribute.

To argue that they were entitled to an instruction on simple possession, Ferguson and Minton implicitly have to argue that the marijuana in the back of the trucks was different marijuana that the marijuana at the marina. Under these circumstances, however, Ferguson and Minton would have committed a separate offense, not a lesser included offense. They were not entitled to the instruction they requested.

## VI.

 *Sufficiency of the Evidence of Importation.* Here we come, at last, to the strongest argument for the defendants. It is made by all six of them. That importation occurred should not be difficult to establish, since the undetected growing in the United States of quantities of marijuana sufficient, undetected, to produce a crop of 15 tons presumably is extremely difficult, if not impossible.[8] The bales of marijuana bore Spanish markings indicating that they originated in a foreign country.

nor *Stroupe,* however, was there independent evidence of a conspiracy. Each case involved two persons; the prosecution attempted to prove that one of the persons knew of and conspired with respect to the illegal activities of the other (other persons were indicted in *Stroupe,* but, because the prosecution acknowledged that those persons were involved in an independent conspiracy, the conspiracy at issue involved only two persons, 538 F.2d at 1066). Here the existence of a conspiracy was established by independent evidence. Once the existence of a conspiracy is established, the evidence need only establish a slight connection with the conspiracy. *See United States v. Laughman,* 618 F.2d 1067, 1076 (4th Cir. 1980), *cert. denied,* 447 U.S. 925, 100 S.Ct. 3018, 65 L.Ed.2d 1117 (1980). The evidence here established that connection.

8. *Contrast United States v. Carrion,* 457 F.2d 200 (9th Cir. 1972), involving 404 pounds (⅕ of a ton) on a plane which landed at a Los Angeles airport.

But the government's burden was significantly greater than simply proving importation, without identifying the importers. It had to show that the particular defendants conspired to do the importing.[9] Looking at the question as a novel one, without regard to decided cases dealing with similar factual situations, we are content that the conspiracy was abundantly proven, and that an accomplished object of the conspirators was the importation.

Navigational charts of the trawler were, in general, stored below. One chart, however, was in the pilot house, inferring use in the most recent setting of courses for the vessel. A track line appeared on it showing successive times and dead reckoning positions of a vessel traveling from the North Carolina coast to a position in excess of 120 miles off the coast of North Carolina. That distance was well in excess of the twelve miles customs limit which governs here for purposes of determining whether there had been importation. The inference that the vessel sailed out from North Carolina, across the 12 mile limit permits, indeed virtually compels, the further inference that the trawler sailed back. It was found at the marina on the North Carolina coast.

The jury could, therefore, reasonably conclude that the most recent journey made by the trawler, with its most recent cargo, 15 tons of marijuana, was one involving importation. The circumstances of the apprehension of some of the conspirators in close proximity to the vessel allowed the further inference that they had had a hand in the operation of the trawler, directly or as charterers.

Further confirmation of those permissible inferences derived from the presence of markings in Spanish, indicating origination from outside the United States, affixed to the bales of marijuana.

No case brought to our attention precludes our abiding by the decision compelled by logic that involvement in the importation by the conspiracy defendants was adequately made out. The defendants rely principally on *United States v. Carrion*, 457 F.2d 200 (9th Cir. 1972), where a plane landed at a Los Angeles airport carrying 404 pounds of marijuana. The marijuana was contained in boxes bearing Spanish writing; one of the defendants had a map of Mexico (together with other maps) in his flight bag,[10] and a matchbook bearing the name of a Mexican motel in his pocket; the plane had used enough fuel for a round trip to Mexico. The court held the evidence insufficient to establish importation beyond a reasonable doubt, saying that at most the evidence was consistent with a claim of importation. The defendants argue that there is even less evidence of importation here than in *Carrion*, because the only evidence of importation is the navigational chart. The defendants further emphasized that the area 120 miles off shore was an excellent fishing area.

However, an airplane's mobility is far greater than that of a trawler operating on the ocean. The possibility of a plane trip anywhere, especially including a trip solely within the United States, was not ruled out.[11] Nor was the possibility excluded, even if the plane went to Mexico, of an intermediate, interrupting stop or stops on the return from Mexico under circumstances which would break the journey and end the importation. In the present case, however, a surface vessel travelling the North Atlantic had not the same flexibility. It is reasonable to infer from an apparently unbroken journey from North Carolina to a point 120 miles off the coast that the same type journey was made on the return, after meeting a ship in international waters and transferring the 15 tons of marijuana later located in the trawler's hold. *Carrion* has been characterized as "borderline." *United States v. Childs*, 457 F.2d 173 (9th Cir.

---

9. *See* I.a., *supra*.

10. The maps contained no indication of any journey, no marking of any positions.

11. The Court observed:

> There was no evidence that the aircraft had been seen in Mexico. The fact that it had used enough fuel and had enough time to make the trip to Mexico does not raise any inference that Mexico had been its destination.
>
> 457 F.2d at 201–02.

1972). What takes the present case over the border is the presence of the navigational chart, marked to show a journey outside the territorial waters for which there was no counterpart in the factual situation of *Carrion*. *Cf. United States v. Odiorne*, 590 F.2d 158 (5th Cir. 1979) (ship's log showed it had sailed from Dutch Antilles to Columbia to intercoastal waterway off Georgia; navigational chart exhibited mark in area of Riohacha, Columbia).

Of course, if a boat is encountered in territorial waters, and the only evidence advanced to support a claim of importation is the size of the boat and the quantity of marijuana, that is not enough. *United States v. Soto*, 591 F.2d 1091, 1104 (5th Cir. 1979), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2862, 61 L.Ed.2d 298 (1979) ("There is no evidence that the 'Captain Salty' ever went outside the territorial waters of the United States or met with any other craft that had. The only evidence which even suggests that the contraband was imported is the size of the shrimp boat and the quantity of marijuana in the cache found to have been transported by the 'Captain Salty.'"). But here we have, in addition, evidence of a recent, unbroken international trip, and that is the crucial difference.

Accordingly, the judgments are
AFFIRMED.