UNITED STATES of America,
Plaintiff–Appellee,

v.

Raymond Franzwa SINCLAIR,
Defendant–Appellant.

No. 91–5698.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 30, 1992.

Decided Jan. 12, 1993.

Sa'ad El–Amin, El–Amin & Crawford, P.C., Richmond, VA, argued, for defendant-appellant.

Julie Marie Campbell, Asst. U.S. Atty., Abingdon, VA, argued (E. Montgomery Tucker, U.S. Atty., on the brief), for plaintiff-appellee.

Before ERVIN, Chief Judge, and WIDENER and WILKINSON, Circuit Judges.

## OPINION

ERVIN, Chief Judge:

Raymond Franzwa Sinclair pleaded guilty to one count of a two-count indictment charging him with conspiracy to possess with intent to distribute crack cocaine in violation of 21 U.S.C. § 846. The plea followed an evidentiary hearing in which the district court entertained a motion by Sinclair and several co-defendants to suppress certain statements relevant to each count of the indictment. Sinclair now appeals from the district court's order partially denying the motion to suppress, arguing that the statements were obtained after an unconstitutional police detention, and that his arrest was not supported by probable cause. Finding no merit in these contentions, we affirm the judgment of the district court.

I

In July 1989 Officer Scott Cline was conducting an undercover drug-dealing investigation in Waynesboro, Virginia. Acting on a tip from a reliable informant, Officer Cline contacted Maurice Levy, an inmate in the Augusta County jail, and while posing as a narcotics dealer offered to procure money for Levy's bail in exchange for crack cocaine. During one of their conversations about the arrangement Levy told Officer Cline: "My boys are suppose [sic] to be coming down tomorrow with a half [kilogram of cocaine]." Levy also stated that his "boys" were to "reach down there [Waynesboro] sometime tomorrow." With respect to their arrival time, Levy said, "[W]ell[,] I don't know what time the bus leaves. But they be down here tomorrow night." When Officer Cline asked whether his "boys" were bringing the cocaine on the bus, Levy answered, "Yea." The following conversation then took place:

Cline: Man that's scary. Do they got a good way to bring it?

Levy: Yeah, don't worry about it man, it's going to be down here.

Cline: Alright.

Levy: Because that stuff is going to be bigger than the one in the radio.

Cline: Alright.

Levy: Better than that.

Cline: Is it going to be ready rock?

Levy: Ready, ready.

Referring to his "boys," Levy remarked, "[I]f they don't know you, they not going to deal with you. But it's Jamaicans, I'm a Jamaican. You know what I'm saying?"

Levy and Officer Cline also discussed a second, unrelated narcotics transaction in which Officer Cline was to obtain a smaller quantity of crack cocaine from Levy's associates in the Waynesboro area. Levy directed Officer Cline to collect the drugs from a local dealer named "Ace," who was holding them in a radio. Levy also bade Officer Cline tell Ace: "Maurice sent you [Cline] from New York." Moreover, Officer Cline learned from Levy that Ace had a girlfriend named Lisa.

After his conversations with Levy, Officer Cline obtained a schedule for buses passing through Waynesboro and Staunton from New York the next day. He concluded from the schedule that Levy's "boys" would arrive either on a 12:35 p.m. bus in Waynesboro, a 1:30 p.m. bus in Staunton, or a bus stopping in Waynesboro later that evening. Officer Cline and two other members of the Waynesboro police force then went to the Waynesboro bus station to await the arrival of the 12:35 bus.

As the bus pulled into the station, Officer Cline joined the queue of passengers waiting to embark. From his position he saw four black males, including a man later identified as Sinclair, get off the bus. He overheard them speaking in what he believed were Jamaican accents. Officer Cline also observed that two of the four were wearing pagers, devices his experience in drug investigation work had led him to associate with narcotics dealers. Officer Cline boarded the bus and asked the driver where the men had embarked; the driver replied that they had come from New York. Officer Cline thereupon joined his fellow officers in their patrol car.

As the four men made their way along a public street leading away from the station, walking in groups of two some distance apart, the officers pulled their car between the first and second groups and ordered the men to stop. Most of the suspects were carrying luggage; one bore a large radio. Drawing their weapons, the officers identified themselves and told the men to drop their bags and place their hands on the car. A pat-down search of the men revealed no weapons. Officer Cline then asked where they were going; one of the four answered that they were "going to Lisa's." Responding to a question from one of the suspects about what was happening, Officer Cline said that he suspected they had drugs.

While Officer Cline was addressing the four suspects, a fellow officer radioed the Virginia State Police to request that a drug-sniffing dog and its trainer be dispatched to the scene. When the dog arrived, Officer Cline placed the luggage and the radio in a line on the ground. On its second walk past the bags, the dog responded as if it sensed the presence of narcotics; on its third pass, the animal alerted to the radio. When Officer Cline asked each suspect whether the radio belonged to him, two of the four said "No." The men were then driven to the Waynesboro police station, fifteen to twenty minutes having elapsed since the initial stop. At the station Officer Cline obtained a search warrant to open the radio. When he discovered crack cocaine inside, the men were read their rights and placed under arrest.

A grand jury charged the four men with conspiracy to possess crack cocaine with intent to distribute, and possession of crack cocaine with intent to distribute, violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(iii), and 846. The defendants then jointly moved to suppress certain evidence and statements taken from them in alleged dereliction of their Fourth, Fifth, and Sixth Amendment rights, arguing that the intrusive techniques employed by the officers escalated the encounter into an arrest. Because the warnings required by *Miranda v. Arizona*, 384 U.S. 436, 445–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), did not follow on the heels of the arrest, the defendants contended that all evidence and statements the police had obtained after the initial stop should be suppressed as fruit of the poisonous tree. Raymond Sinclair, one of the four defendants and the appellant in this case, further moved to dismiss the indictment against him.

The district court identified three issues in the defendants' motion to suppress: (1)

whether the initial stop was a valid investigative detention; (2) when, if ever, the initial stop escalated into an arrest; and (3) whether that arrest was supported by sufficient probable cause. The court concluded that (1) the initial stop was a valid investigative detention under the rule announced in *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); (2) the initial stop became an arrest from the moment the sniffing dog alerted to the radio; and (3) Officer Cline's discussions with Maurice Levy, coupled with his observations of the four suspects, supported a finding of probable cause for the defendants' ultimate arrest. The district court therefore granted the defendants' motion to suppress all statements made by them from the moment they were *de facto* arrested (about 1:00 p.m.) until shortly after they were read their rights (about 2:50 p.m.), and denied the motion as to statements made before the dog alerted. The court also denied Sinclair's motion to dismiss the indictment as to him. 732 F.Supp. 656. This appeal followed.

## II

Sinclair assigns error to two of the three conclusions that sustained the district court's partial denial of the defendants' motion to suppress. Specifically, he claims that Officer Cline had no probable cause to arrest him, and that the court did not determine correctly when his arrest took place. We address these points in turn, reviewing legal conclusions involved in the district court's suppression determination *de novo*. *See United States v. Rusher*, 966 F.2d 868, 873 (4th Cir.1992).

### A.

■ First, Sinclair argues that the police did not have probable cause to arrest him. We are mindful that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). The standard for whether probable cause exists

is an objective one; it exists when, "at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *United States v. Manbeck*, 744 F.2d 360, 376 (4th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985). Probable cause can, therefore, be based on an assessment of a "combination of factors," *United States v. Hummer*, 916 F.2d 186, 190 (4th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1608, 113 L.Ed.2d 670 (1991), that reflect the totality of the circumstances known to the investigating officer. *Gates*, 462 U.S. at 230, 103 S.Ct. at 2328.

We find the Supreme Court's decision in *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959)—"the classic case on the value of corroborative efforts of police officials," *Gates*, 462 U.S. at 242, 103 S.Ct. at 2334—to be controlling on the probable cause question presented here. There an informant reported that Draper would arrive in Denver on a train from Chicago on one of two days, and that he would be bearing a quantity of heroin. The informant also supplied a somewhat detailed physical description of Draper, predicting that he would be dressed in a raincoat, brown slacks, and black shoes, would be carrying "a tan zipper bag," and would be walking "real fast." *Draper*, 358 U.S. at 309, 79 S.Ct. at 331. On one of the stated dates Denver police officers saw a man matching this description leave a train arriving from Chicago; his attire and luggage matched the informant's report and he was walking rapidly. As the Supreme Court explained, by this point in his investigation the arresting officer "had personally verified every facet of the information given him by [the informant]" except whether Draper had heroin on his person, and had "reasonable grounds" to believe that the unverified information would likewise be true. *Id.* at 313, 79 S.Ct. at 333.

A brief comparison of the instant facts with those of *Draper* reveals their close kinship. Like the investigating officers in *Draper*, Officer Cline had been informed

by Maurice Levy that (1) Levy's "boys" would be coming "down" by bus; (2) Levy was from New York; (3) the men would be Jamaicans; (4) the men would be arriving on a certain day, by nightfall; and (5) the men were bringing narcotics. He compared what Levy had said with what he observed and learned in the bus station: (1) that the men had boarded the bus in New York; (2) that more than one suspect was present; (3) that the men had Jamaican accents; (4) that the bus arrived on the designated day before nightfall; and (5) that two of the men were wearing pagers, which Officer Cline's experience in narcotics investigations had led him to associate with drug dealers. The suspects thus matched in at least four particulars the description Officer Cline had received from Levy.

The Supreme Court has clearly stated that probable cause determinations are neither technical nor abstruse; " 'they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Gates*, 462 U.S. at 231–32, 103 S.Ct. at 2328 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)). Given the Court's "commonsense" approach, *see United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), we have no difficulty concluding that Officer Cline had sufficient probable cause to arrest Sinclair. The showing of probable cause in the instant case was fully as compelling as that in *Draper*. Moreover, the Supreme Court has made it clear that when a trained narcotics dog alerts to an item, as in this case, the police have probable cause to arrest. *See Florida v. Royer*, 460 U.S. 491, 506, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion). We therefore reject Sinclair's contention that the police lacked sufficient probable cause to arrest him.

### B.

Second, Sinclair contends that the district court erred in failing to determine that he was arrested from the moment the police initially stopped him. He argues that the officers' use of drawn weapons to detain him and his companions was not the least intrusive means of effecting the limited investigative purpose of the stop, that Officer Cline had no reason to believe Levy's "boys" were armed or dangerous, and that the pat-down search rendered the encounter both intimidating and coercive. Sinclair therefore asserts that the *Terry* stop was, in fact, a full-blown arrest. Because the police failed to administer *Miranda* warnings to the suspects immediately after arresting them, he reasons, all statements made by them should have fallen victim to the suppression motion.

■ Neither the pronouncements of the Supreme Court nor our own precedents lend support to Sinclair's arguments. Although "the investigative methods employed [in a *Terry* stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion), the Supreme Court has held that in conducting *Terry* stops investigating officers may take steps reasonably necessary to maintain the status quo and to protect their safety, including drawing their weapons. *See United States v. Hensley*, 469 U.S. 221, 235, 105 S.Ct. 675, 683–84, 83 L.Ed.2d 604 (1985). Our own caselaw of the past decade reflects the Court's view: "Although ... approaching a suspect with drawn weapons [is an] extraordinary measure[ ], such police procedures have been justified in this circuit as a reasonable means of neutralizing potential dangers to police and innocent bystanders." *United States v. Taylor*, 857 F.2d 210, 213–14 (4th Cir.1988) (citations omitted); *see also United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir.), *cert. denied*, 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987) (" 'There is no reason why an officer, rightfully but forcibly confronting a person suspected of serious crime, should have to ask one question and take the risk that the answer might be a bullet.' " (quoting *Terry v. Ohio*, 392 U.S. 1, 33, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring))); *United States v. Manbeck*, 744 F.2d 360, 377 (4th Cir.1984), *cert. de-*

*nied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985) (calling drawn weapons a "justified safety precaution" in *Terry* stops); *United States v. Perate,* 719 F.2d 706, 709 (4th Cir.1983) (stating that an "officer may draw his gun and conduct a frisk when justified as a reasonable precaution for protection and safety'") (quoting *United States v. Seni,* 662 F.2d 277, 283 (4th Cir.1981), *cert. denied,* 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982)).

■ Nor does the fact that Officer Cline had no reason to believe Levy's "boys" were armed and dangerous make the officers' drawing of weapons improper. In *Seni* a police officer stopped and frisked at gunpoint two persons suspected of drug-related offenses without knowing whether they were armed or dangerous. *Seni,* 662 F.2d at 282–83. We found nothing improper about the stop:

> The fact that the officer drew his gun and frisked [the suspects] does not necessarily elevate the stop into an arrest. [A]n officer may draw his gun and conduct a frisk when justified as a reasonable precaution for protection and safety.

*Id.* at 283. In so ruling we relied upon *United States v. Worthington,* 544 F.2d 1275 (5th Cir.), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977), in which the court observed that experience with drug traffickers might lead law enforcement officials to fear bodily harm in conducting a *Terry* stop, making the drawing of weapons a reasonable safety precaution. *See id.* at 1280 n. 3. We believe these holdings squarely address the gravamen of Sinclair's argument. Therefore, it was not unreasonable for the officers in the instant case to employ drawn weapons to stop and frisk the suspects. Such tactics do not *per se* elevate a brief * investigative detention into an arrest. "A brief but complete restriction of liberty is valid under *Terry.*"

*United States v. Moore,* 817 F.2d 1105, 1108 (4th Cir.), *cert. denied,* 484 U.S. 965, 108 S.Ct. 456, 98 L.Ed.2d 396 (1987); *cf.* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* 204 (2d ed. 1992) (noting that "the drawing of weapons will sometimes be a reasonable precaution for the protection of officers and bystanders").

■ Sinclair's contention that the pat-down search escalated the encounter into an arrest is equally unpersuasive. In *Moore,* we held that "[a]n officer making a lawful investigatory stop may protect himself by conducting a search for concealed weapons whenever 'he has reason to believe that the suspect is armed and dangerous.'" *Id.* at 1107 (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972)). As noted above, the officer's reasonable belief may derive as much from his experience in similar cases as from his precise knowledge of the dangerous propensities of the suspect at hand. Moreover, the intrusion here was limited. The officers patted down the outside of Sinclair's clothes; there is no indication that they reached inside his pockets. Justice Harlan's reasoning applies as much to the pat-down search as to the drawing of weapons: there is no reason Officer Cline and his companions should have to ask one question and take the risk that the answer might be a bullet. *See Terry v. Ohio,* 392 U.S. 1, 33, 88 S.Ct. 1868, 1886, 20 L.Ed.2d 889 (1968) (Harlan, J., concurring).

Despite the weight of these authorities, Sinclair nonetheless contends that the stop-and-frisk was so intrusive that it amounted to an arrest. He argues that, because he did not feel free to leave during the stop, he was in a custodial situation. As we noted in *Moore,* however, the perception that one is not free to leave is insufficient to convert a *Terry* stop into an arrest. *See*

---

* In addition, Sinclair could not successfully argue that the length of the *Terry* stop in the instant case—twenty minutes—was excessive. In *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court rejected a previous holding of ours because it "would effectively establish a *per se* rule that a 20–minute detention is too long to be justified under the *Terry* doctrine." *Id.* at 686,

105 S.Ct. at 1575. Such a result, the Court observed, "is clearly and fundamentally at odds with our approach in this area." *Id.; cf. United States v. Place,* 462 U.S. 696, 709 n. 10, 103 S.Ct. 2637, 2646 n. 10, 77 L.Ed.2d 110 (1983) ("expressly reject[ing] the suggestion that [the Court] adopt a hard-and-fast time limit" for *Terry* stops, *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575).

**604**

*Moore,* 817 F.2d at 1108. Although an individual may be "seized" within the meaning of the Fourth Amendment when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion) (footnote omitted), *Terry* made it clear that a seizure which is limited in its intrusiveness may be reasonable under the Fourth Amendment. Because the encounter between Sinclair and the police was one of precisely such limited intrusiveness, we reject the argument that it constituted an arrest.

### III

For the foregoing reasons, we find Sinclair's arguments meritless and the conclusions of the district court wholly persuasive. Accordingly, the judgment is

AFFIRMED.