46 F.3d 1127
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rochette Damon HAIRSTON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dario SYLVAN, a/k/a Albert Suriel, Defendant-Appellant.
 Nos. 94-5416, 94-5469.
 United States Court of Appeals, Fourth Circuit.
 Argued Dec. 9, 1994.
Decided Feb. 10, 1995.
 
 Michael W. Patrick, Haywood, Denny, Miller, Johnson, Sessoms & Patrick, Chapel Hill, NC, for appellant Hairston.
 Thomas H. Johnson, Jr., Gray, Moses, Newell & Johnson, Greensboro, NC, for appellant Sylvan.
 Richard S. Glaser, Jr., Asst. U.S. Atty./Chief, Criminal Division, Greensboro, NC, for appellee.
 Walter C. Holton, Jr., U.S. Atty., Sonja M. Reeves, Third Year Law Student, Wake Forest University, Greensboro, NC, for appellee.
 Before NIEMEYER and MICHAEL, Circuit Judges, and MESSITTE, United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Rochette Damon Hairston and Dario Sylvan were each convicted of conspiracy to possess with intent to distribute crack cocaine. A third co-conspirator, Danny Murphy, cooperated with the government and testified against Hairston and Sylvan at trial. Hairston was sentenced to 174 months imprisonment, and Sylvan to 163 months. They now challenge numerous aspects of their trial and sentencing.
 
 
 2
 * On October 26, 1993, Rochette Damon Hairston, Dario Sylvan, and Danny Murphy drove to a location near Mayodan, North Carolina, where Murphy had previously arranged to meet to sell six ounces of crack cocaine to Jimmy Miller. Unbeknownst to the three, Miller was an undercover police officer. This was Murphy's fifth drug deal with Miller. In preparation for the drug sale on October 26, Murphy contacted Sylvan to see if Sylvan could provide the needed crack. Sylvan told Murphy that he did not have any more, but thought that crack could be obtained from Hairston. Murphy and Sylvan drove from Sylvan's motel room at the Arborgate Inn in Eden, North Carolina, to Hairston's house in Martinsville, Virginia, to attempt to procure the crack. Once there, Hairston and Sylvan had a private discussion, and Hairston then went into another room and returned with four ounces of crack. When Sylvan told Hairston that Sylvan and Murphy intended to deliver the crack to the pre-arranged buyer, Hairston indicated that he wanted to go along. The three then headed off to the pre-arranged meeting with Miller. Before arriving, Hairston passed the bag with the crack cocaine to Sylvan, who handed it to Murphy for delivery to the buyer. After Murphy exited the car and delivered the drugs to Miller, Miller arrested Murphy. Other undercover policemen at the scene arrested Hairston and Sylvan who were still seated in Murphy's car.
 
 
 3
 Upon Murphy's arrest, he cooperated with the government in the prosecution of the case. Upon Sylvan's arrest, the room key to his Arborgate Inn motel room was seized, as was a memo indicating the amounts of money others (including Murphy) owed him (presumably for drugs). Sylvan also made a statement in which he told police officers that he had handed a bag to Murphy before Murphy delivered the drugs to Miller. As a result of the information provided by Murphy and Sylvan, the officers obtained a search warrant to search Sylvan's room at the Arborgate Inn, where they seized residue amounts of crack cocaine. A search warrant was also secured for Hairston's house in Martinsville, Virginia, where police officers found various amounts of cocaine and marijuana, a set of electronic scales, and two firearms.
 
 
 4
 At sentencing, Hairston received a two-level enhancement for possession of a firearm because firearms were recovered from his premises.
 
 II
 
 5
 Hairston contends first that the search warrant for his residence was not supported by facts establishing probable cause. He argues that the warrant was based in part on information given by a number of unknown informants, whose reliability and basis of knowledge were not established, and that there was no indication of the temporal proximity between the events described by these informants and the date of the search. Although the warrant was also based in part on the very salient information provided by Murphy in his post-arrest statement--in which Murphy indicated that he had obtained four ounces of crack from Hairston at Hairston's residence earlier that day--Hairston maintains that the warrant as a whole was not based on facts showing probable cause.
 
 
 6
 Aside from the fact that the information received from various other sources was consistent, we note that Murphy's statements alone would constitute probable cause for the search of Hairston's house for drugs. The facts as given in the warrant are:
 
 
 7
 On October 26, 1993 members of the Rockingham County Sheriff's Office and Special Agent Charlie W. Moore of the Virginia State Police arrested Danny Murphy. At his arrest, Danny Murphy stated to Agent Moore that he, on this day [October 26] had been in the residence of Rochette Hairston at 30 South Barton Street. Murphy stated that he observed Hairston place approximately 4 ounces of crack cocaine in a brown paper bag and leave the residence. Murphy further states that he has been to the residence on two other occasions and purchased cocaine. Murphy stated that there was cocaine at the residence on these other occasions.
 
 
 8
 The warrant also indicated that Murphy's statement was against his penal interest.
 
 
 9
 In connection with our review of a magistrate judge's finding of probable cause, we stated in United States v. Lalor, 996 F.2d 1578 (4th Cir.), cert. denied, 114 S.Ct. 485 (1993):
 
 
 10
 In reviewing a magistrate's probable cause determination, our task is to determine whether the magistrate had a substantial basis for the decision.... We accord the magistrate's decision "great deference," and will not invalidate a warrant "by interpreting [an] affidavi[t] in a hypertechnical, rather than a commonsense, manner."
 
 
 11
 Id. at 1581. Thus, even apart from the information provided by the confidential government informants and by anonymous private citizens as to drug dealing out of Hairston's house, we conclude that the magistrate judge was provided with sufficient evidence to establish probable cause that drugs would be found at Hairston's house and to support the search warrant.
 
 III
 
 12
 Sylvan contends that the officers did not have probable cause to arrest him and that his mere presence in Murphy's car while Murphy delivered the drugs to Miller was an insufficient basis for his arrest. He argues also that the mere act of riding in a car with a known drug dealer (Murphy) does not provide probable cause to justify his arrest.
 
 
 13
 It is settled that a police officer can make a public arrest without a warrant if the officer has probable cause to believe a felony has been committed. See United States v. McCraw, 920 F.2d 224 (4th Cir.1990). Probable cause, derived from the totality of the circumstances, exists if " 'at that moment the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense.' " Id. at 227.
 
 
 14
 In the instant case, the officers who arrested Sylvan--a passenger in Murphy's car at the site of the pre-arranged drug sale--knew that Murphy was a drug dealer, as he had engaged in four other undercover drug sales to Miller in the recent past. Moreover, at each of these sales, Murphy had always been accompanied by two black males. At the sale in this case, Murphy was also accompanied by two black males, Sylvan and Hairston. At this transaction, when Murphy first drove up to meet Miller, the three men in the car--Murphy, Sylvan, and Hairston--eyed Miller for a while and had a lengthy conversation amongst themselves before Murphy left to deliver the drugs. Based on the totality of these circumstances, the arresting officers had probable cause to believe that Sylvan was a co-conspirator in the drug transaction underway.
 
 IV
 
 15
 Sylvan also contends that the officers did not have probable cause to obtain the warrant to search his motel room at the Arborgate Inn.
 
 
 16
 He argues that Murphy's statement, on which the officers relied, did not state that there were drugs or guns in Sylvan's motel room and provided police with no other basis for probable cause to support this warrant. We disagree.
 
 
 17
 When the warrant was requested for the search of Sylvan's room, police had the following information: (1) In an earlier statement that Murphy had given to the police, Murphy said that he had picked Sylvan up from the bus station the day before the drug sale and that Sylvan had given Murphy an amount of cocaine to pay for the room; (2) A memo seized from Sylvan's person upon his arrest reflected amounts of money other individuals owed him (presumably for drugs); (3) A membership card to a fitness club under an alias (Ronald Velasquez) was also seized from Sylvan at the time of his arrest; (4) The key to the room at the Arborgate Inn taken from Sylvan at the time of his arrest, linked him to the room; (5) Sylvan was in the car with Murphy and had handed the drug bag to Murphy before Murphy left to deliver the drugs; and (6) Sylvan participated in the conversation with Murphy and Hairston before Murphy delivered the drugs to Miller.
 
 
 18
 In reviewing a magistrate's probable cause determination, our task is to "determine whether the magistrate had a substantial basis for the decision" that there was probable cause that contraband or evidence of a crime will be found in a particular place. United States v. Lalor, 996 F.2d 1578, 1581 (4th Cir.), cert. denied, 114 S.Ct. 485 (1993). In doing so, we accord "great deference" to the magistrate's determination. Id. Based on the information the police knew about Sylvan, we conclude that the magistrate judge did not err in determining that there was probable cause that Sylvan's motel room contained evidence of the drug conspiracy on which Sylvan was later indicted.
 
 V
 
 19
 Hairston next contends that drugs and firearms seized from his residence were improperly admitted under Federal Rule of Evidence 404(b) as evidence of other crimes, wrongs, or acts.
 
 
 20
 In searching Hairston's residence pursuant to a search warrant, officers recovered various amounts of illegal drugs, including cocaine and marijuana; electronic scales; a fully loaded .22 Derringer five-shot pistol from a jacket in Hairston's bedroom; and a .22 caliber semi-automatic Intratec pistol from under a sofa. Hairston argues that the two handguns and the drugs found at his residence, which were not used in the sale, had no relevance to the particular conspiracy for which he was charged, and it was error under Rule 404(b) to have admitted them.
 
 
 21
 It appears that the judge admitted the evidence of the drugs and guns seized from Hairston's house as relevant evidence of the drug conspiracy, and not as evidence of other acts under F.R.E. 404(b). In ruling, the judge stated:
 
 
 22
 Well [the drugs and guns] could prove he had been involved in the conspiracy, but not just an innocent [bystander].... I don't think it is unduly prejudicial, and I think it has substantial probative value on knowledge and intent, at least, on the charges against the defendant in this case. I'm not even sure it's 404(b), frankly. It's part of the case in chief, it would seem, as much as 404(b).
 
 
 23
 We do not believe that the trial judge abused his discretion in admitting this evidence because the evidence relates directly to the locus of the drugs and to Hairston's role in the conspiracy as a planner and as the provider of the drugs. Moreover, we have consistently held that evidence of firearms is relevant to charges of drug possession and conspiracy. See, e.g., United States v. Collazo, 732 F.2d 1200 (4th Cir.1984) (firearms seized from defendant's house were properly admitted into evidence where defendant was charged in drug conspiracy), cert. denied, 469 U.S. 1105 (1985); United States v. Ricks, 882 F.2d 885 (4th Cir.1989) (upholding admission of evidence of firearms at drug conspiracy trial under F.R.E. 404(b)), cert. denied, 493 U.S. 1047 (1990).
 
 VI
 
 24
 Sylvan contends that his statements made to police officers after his arrest and after receiving his Miranda warnings should have been suppressed as involuntary and coerced because these statements were made after Agent Strader falsely told Sylvan that either Hairston or Murphy had implicated Sylvan in the conspiracy. After being so informed, Sylvan made a statement to police in which he indicated that he had handed a bag, which he assumed to contain drugs, to Murphy prior to Murphy's leaving the car to deliver the bag to Miller and that, as Murphy was leaving, Murphy said "42" to Sylvan and Hairston, indicating that the price for the drugs would be $4,200.
 
 
 25
 Agent Strader, who elicited Sylvan's statement, testified that he had been told by Detective Hall that Murphy had implicated Sylvan, and that he took Detective Hall's word as accurate, although he did not have firsthand knowledge of whether Murphy had implicated Sylvan. In fact, it appears that the recorded statement made by Murphy to which Strader was alluding did not implicate Sylvan, although evidence adduced at trial showed that immediately subsequent to his arrest, Murphy stated that Sylvan had given him cocaine for securing Sylvan's motel room at the Arborgate Inn. Because Strader's assumption and statement to Sylvan were erroneous, Sylvan argues that his statements in response (about having handed Murphy a bag and about Murphy's reference to the price of the drugs) were involuntary, and therefore their use violated his rights.
 
 
 26
 Sylvan has referred us to no case that stands for the proposition that a statement (not amounting to a confession) procured after an officer unwittingly gave false information to that defendant is an involuntary, coerced statement and should be excluded. In these circumstances, we find that Agent Strader's unwittingly erroneous statement did not coerce Sylvan's subsequent statement or render it involuntary. Accordingly, we reject the claim.
 
 VII
 
 27
 Sylvan next contends that he was denied the opportunity to cross-examine Agent Strader fully on the content of Sylvan's own pretrial statement. He argues that his rights under the Sixth Amendment's Confrontation Clause were thus violated, necessitating a mistrial.
 
 
 28
 At trial, Sylvan's attorney wished to make clear to the jury that, while riding to the scene of the drug sale, Hairston (a passenger) passed the bag containing the drugs to Sylvan (a passenger) who only momentarily held the bag before passing it on to Murphy (the driver).
 
 
 29
 Bruton-type problems arose when Sylvan's attorney attempted to ascertain this information from the agent without having the agent state that it was Hairston who held the bag for most of the trip, because Hairston did not testify. The trial judge conducted a detailed bench conference, framed the question in a way that would accomplish Sylvan's purpose without implicating Hairston, and directed Sylvan's counsel to ask the question the way the judge framed it (while noting that it was irrelevant to Sylvan's guilt or innocence whether he held the bag for one moment or for the entire ride). After the bench conference, Sylvan's attorney elicited testimony from Agent Strader to the effect that in Sylvan's post-arrest statement, Sylvan did not state that he had carried the bag of drugs into the car or that he carried it for the duration of the trip.
 
 
 30
 Under these circumstances, we conclude that the district judge did not abuse his discretion in denying Sylvan's motion for a mistrial.
 
 VIII
 
 31
 Sylvan contends that there was insufficient evidence to support the jury's guilty verdict on the conspiracy charge and that therefore the district court should have granted his motion for judgment of acquittal.
 
 
 32
 When reviewing a conviction for insufficiency of evidence, the verdict of a jury must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." United States v. Brown, 856 F.2d 710, 711 (4th Cir.1988). With regard to the sufficiency of a drug conspiracy conviction, we have stated:
 
 
 33
 To sustain [a] conspiracy conviction, there need only be a showing that defendant knew of the conspiracy's purpose and some action indicating his participation.... These elements can be shown by circumstantial evidence such as his relationship with other members of the conspiracy, the length of this association, his attitude, conduct, and the nature of the conspiracy. Collazo, 732 F.2d at 1205. Thus, once the existence of a conspiracy is established, the evidence need establish only a slight connection between a defendant and the conspiracy. United States v. Seni, 662 F.2d 277 (4th Cir.1981), cert. denied sub nom., Minton v. United States, 455 U.S. 950 (1982). Furthermore, a defendant may be convicted of conspiracy even if he joins the conspiracy without full knowledge of all of its details and even if he only plays a minor part, as long as he understands the unlawful nature of the conspiracy. United States v. Roberts, 881 F.2d 95 (4th Cir.1989). And, once a conspiracy is established, each co-conspirator is liable for the substantive offenses of every other member that were committed in the course of and furtherance of the conspiracy. Pinkerton v. United States, 328 U.S. 640 (1946).
 
 
 34
 In this case, evidence was introduced against Sylvan at trial that: (1) Murphy had known Sylvan for some time and believed that Sylvan sold crack cocaine for a living; (2) When Murphy and Sylvan met the day before the drug sale took place, Murphy secured a motel room for Sylvan, and Sylvan "fronted" Murphy an "eight-ball" (3.5 grams) of crack cocaine, for which Murphy then owed Sylvan $200; (3) Sylvan had drugs taped to his groin when Murphy drove with Sylvan to Hairston's house on the day of the drug sale; (4) Sylvan told Murphy that he could procure (via Hairston) the amount of drugs Murphy needed to deliver to Miller; (5) Sylvan directed Murphy to drive the two of them to Hairston's house, where they could obtain the requisite amount of crack cocaine to sell to Miller; (6) Upon arriving at Hairston's house, Sylvan asked Hairston to provide six ounces of crack cocaine, and when Hairston protested that this was too much, Sylvan insisted that Hairston should at least be able to provide four ounces. Sylvan and Hairston also had a private meeting (apart from Murphy) at Hairston's house; (7) At Hairston's house, it was agreed that Hairston would provide Murphy and Sylvan with four ounces of crack, and that the three would travel together to the agreed-upon site; (8) Before arriving at the site of the drug sale, Sylvan handed the crack cocaine to Murphy to deliver to Miller; (9) Sylvan and Hairston dictated to Murphy the price to charge Miller for the crack cocaine.
 
 
 35
 Taking this evidence in the light most favorable to the government, there was ample evidence to support the guilty verdict against Sylvan.
 
 IX
 
 36
 Hairston and Sylvan contend that the range of prison sentences for drug crimes involving crack cocaine under U.S.S.G. Sec. 2D1.1(c)(6) violates their constitutional rights under the Equal Protection Clause, the Due Process Clause, and the Eighth Amendment protection against cruel and unusual punishment, because the Sentencing Guidelines set out higher penalties for cocaine base (crack cocaine) than for cocaine powder. Under the Sentencing Guidelines, one unit of crack cocaine is equivalent to 100 units of cocaine powder.
 
 
 37
 We have previously held that the differential punishments for possession of quantities of crack cocaine versus cocaine powder are not racially discriminatory or otherwise violative of the equal protection component of the Due Process Clause. See, e.g., United States v. D'Anjou, 16 F.3d 604 (4th Cir.1994); United States v. Thomas, 900 F.2d 37 (4th Cir.1990). Moreover, neither Hairston's nor Sylvan's prison sentence for drug conspiracy convictions violates the Eighth Amendment. See Harmelin v. Michigan, 501 U.S. 957 (1991).
 
 
 38
 In light of precedent directly on point, we reject appellants' argument.
 
 X
 
 39
 Finally, Hairston contends that the district court erred in increasing his base offense level for sentencing by two levels, pursuant to U.S.S.G. Sec. 2D1.1(b), for possession of a firearm.
 
 
 40
 In searching defendant Hairston's house pursuant to a warrant, officers recovered a fully loaded .22 Derringer five-shot pistol from a jacket in Hairston's bedroom and a .22 caliber semi-automatic Intratec pistol from under a sofa. At sentencing, Hairston introduced the affidavits of Yvette Stockton and Sharon Reid attesting that they were the owners of the seized firearms and that they had left them at Hairston's residence for safekeeping. Nevertheless, the sentencing judge found that the two-level enhancement should be given to Hairston because the firearms--regardless of their ownership--were possessed by him, having been present at Hairston's house at the time of the conspirators' preparation for the drug sale.
 
 
 41
 We had occasion to consider this same issue in United States v. Apple, 962 F.2d 335 (4th Cir.1992), where defendant's sentence was enhanced under Sec. 2D1.1(b)(1) because of the presence of a firearm at his place of residence where the defendant had arranged for the distribution of drugs. Rejecting defendant's challenge that there was insufficient evidence linking the firearm to the commission of the conspiracy, we held that:
 
 
 42
 possession of the weapon during the commission of the offense is all that is needed to invoke the enhancement. The sentencing court is not required to find any more of a connection between the possession of the weapon and the commission of the drug offense.... [Defendant] also contends that there must be some geographical and temporal proximity between the weapon and the commission of the offense, but it is clear under the Guidelines that when the offense committed is conspiracy, these proximity conditions are met when the weapon is discovered in a place where the conspiracy was carried out or furthered.
 
 
 43
 Id. at 338. See also United States v. Falesbork, 5 F.3d 715 (4th Cir.1993).
 
 
 44
 Similarly, we conclude that the district court did not err in enhancing Hairston's sentence based on the presence of firearms at his house, indeed in a jacket in his room, even though the firearms were not owned by him.
 
 
 45
 For the reasons given, we affirm the judgments of the district court.
 
 
 46
 AFFIRMED.