23 F.3d 404
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Tyrone Deandre WOLFE, a/k/a James Lamont Caldwell,
Defendant-Appellant.
 No. 93-5154.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 9, 1993.
Decided Apr. 4, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Benson E. Legg, District Judge. (CR-92-285-L)
 Denise Charlotte Barrett, Asst. Federal Public Defender, Baltimore, Md., for appellant.
 Stuart A. Berman, Asst. U.S. Atty., Baltimore, Md., for appellee.
 On Brief: James K. Bredar, Federal Public Defender, Baltimore, Md., for appellant.
 Gary P. Jordan, U.S. Atty., Baltimore, Md., for appellee.
 D.Md.
 AFFIRMED.
 Before HALL, PHILLIPS, and MURNAGHAN, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Tyrone Deandre Wolfe was arrested and convicted for 1) possession of a firearm by a convicted felon in violation of 18 U.S.C. Sec. 922(g) and 2) possession of an unregistered firearm in violation of 26 U.S.C. Sec. 5861(d). Wolfe pled guilty to both counts following the district court's denial of his motion to suppress evidence of the shotgun and ammunition seized from his person during the arrest. The district judge upheld the legality of Officer Randy Dull's stop and frisk of Wolfe and the ensuing arrest. Wolfe specifically reserved the right to appeal the denial of his suppression motion pursuant to Federal Rule of Criminal Procedure 11(a)(2). The court sentenced Wolfe to forty months imprisonment on each count to run concurrently, three years of supervised release, and a one hundred dollar assessment.
 
 
 2
 On appeal, Wolfe has challenged the legality of the stop and frisk conducted by Officer Dull. In addition, he has challenged the legality of Sentencing Guideline Sec. 2K2.1, questioning the Commission's authority to set offense levels according to the defendant's criminal history where Congress has not explicitly authorized it to do so. We affirm the district court's decision in both respects.
 
 
 3
 On the evening of March 26, 1992, Officer Dull, a twelve-year veteran of the Baltimore City police force, was on uniformed foot patrol in an area that included the 2900 block of Spring Hill Avenue. Officer Tom Gause was also assigned to patrol the area in a marked police car. At the suppression hearing, Dull cited statistics identifying the neighborhood as a high crime area.[1] Two locations in the area were suspected narcotics trafficking locations--the Spring Hill Market and the residence located at 2903 Spring Hill Avenue.[2]
 
 
 4
 Dull watched the house at 2903 Spring Hill Avenue from a covert location. Over a period of twenty minutes he observed three or four transactions which he believed to be drug sales. Although it was raining steadily, Wolfe was pacing back and forth along the street between the alley just before the house at 2903 Spring Hill Avenue and the market on the corner--a distance of about 100 feet. He appeared to be watching the people coming to and from the house. Dull testified at trial that he suspected Wolfe was either preparing to rob someone or acting as a "gun man or enforcer" for the drug house.[3] Dull did not refer to either of those suspicions in the police report he wrote the night he arrested Wolfe.[4] In his report, Dull stated that he observed Wolfe just loitering despite a heavy downpour. Although there were eight to ten other people in the immediate vicinity, Wolfe did not interact with any of them directly.
 
 
 5
 Officer Gause drove into the Spring Hill Avenue area at approximately 7:00 p.m. Wolfe became "nervous" when he saw Gause's marked police car and "changed his direction walking into the corner store quickly." Four or five black males who had been standing on the corner as Gause approached also went into the store. Stopping briefly in front of the corner store, Gause observed Wolfe walk to the back of the store and stand with his back to the wall and his arms folded across his chest. He did not interact with others in the store. He did not buy anything, nor did he play the video games. Gause continued driving around the block after making those observations.
 
 
 6
 Dull contacted Gause by radio to tell him about a suspected buyer that Dull wanted to question. Gause drove back onto Spring Hill Avenue and stopped the individual that Dull had observed participating in what appeared to be a drug transaction. Dull came out of his covert location and joined Gause. While they were questioning the individual, Wolfe exited the corner store and began walking away from the officers very quickly. Gause saw Wolfe leaving and told Dull to stop him.
 
 
 7
 Wolfe was wearing a hooded sweatshirt which he had pulled over his head, and he had his hands in his pockets. Dull walked up on Wolfe's blind side, grabbed his hands, and said,"Police. Just be cool." He testified that he could feel a hard object that he knew was a gun immediately upon grabbing Wolfe's hands. Dull arrested Wolfe for violation of Maryland's gun laws, searched him, and located a sawed-off shotgun in his right inside coat pocket. One round of ammunition was in the gun. Dull found six additional shells in Wolfe's coat pockets. In his report, Dull said that he conducted the pat down of Wolfe's outer garments for his own safety due to the recent shootings, handguns recovered in the area, and Wolfe's apparent nervousness.
 
 I. The Terry Stop and Frisk
 A. The District Judge's Legal Conclusion
 
 8
 Although an appellate court must make an independent determination on the issue of the legality of an arrest, the district court's findings of fact will not be disturbed unless they are clearly erroneous.
 
 
 9
 United States v. McCraw, 920 F.2d 224, 227 (4th Cir.1990). Anderson v. Bessemer City, 470 U.S. 564, 573-74 (1985), provides the following elaboration of the clearly erroneous standard:
 
 
 10
 If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 11
 The district judge credited the uncontradicted testimony of Officers Dull and Gause as to the events of March 26, 1992. Wolfe has challenged the district judge's legal conclusion that the facts presented by the officers provided an adequate basis for an investigative stop. Specifically, Wolfe has claimed that the officers did not have an individualized suspicion that Wolfe was armed and dangerous. Moreover, Wolfe has contended that the amount of force used in stopping Wolfe was unreasonable.
 
 
 12
 In Terry v. Ohio, 392 U.S. 1, 20-22 (1968), the Supreme Court held that a police officer can stop an individual for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest. To justify the stop, an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts," give rise to a suspicion or belief that criminal activity is taking place. Id. at 27. In addition, a police officer can conduct a reasonable search, or frisk, for weapons when the officer has reason to believe that he or she is dealing with an armed and dangerous individual, regardless of whether there is probable cause to arrest that individual for a crime. Id.
 
 
 13
 United States v. Cortez, 449 U.S. 411, 417-18 (1981), reiterated the requirement that, based upon "the whole picture," "officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." In United States v. Crittendon, 883 F.2d 326, 328 (4th Cir.1989), we held that "[t]he presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." In Cortez, those circumstances were delineated as follows: "various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers." Cortez, 449 U.S. at 418.
 
 
 14
 The district judge found that the objective observations that Officers Dull and Gause had the opportunity to make as they were patrolling the 2900 block of Spring Hill Avenue supported their suspicion of Wolfe. The judge listened to the testimony of the officers and considered it in light of their knowledge of the recent crime wave in the immediate vicinity, their experience investigating similar drug operations, and their overall experience on the police force.
 
 
 15
 Wolfe has argued that the stop conducted by Dull was impermissible because the officers did not have an individualized suspicion that Wolfe was armed and dangerous.[5] Under Terry, however, the officers needed only a suspicion or belief that criminal activity was taking place based on specific and articulable facts. Dull testified that he believed, based on information from arrested informants and members of the Northwest Drug Unit as well as on his own observations on the night of March 26, 1992, that Wolfe may have been acting as a gun man for the drug operation suspected at 2903 Spring Hill Avenue. Wolfe's behavior also indicated to the officers that he was trying to avoid any contact with the police. Finally, the officers were patrolling an area with a demonstrated high rate of crime and significant drug activity.
 
 
 16
 Although not enough standing alone to raise a reasonable suspicion, " 'an area's disposition toward criminal activity is an articulable fact' " that may inform an officer's reasonable suspicion of a suspect. United States v. Moore, 817 F.2d 1105, 1107 (4th Cir.), cert. denied, 484 U.S. 965 (1987) (quoting United States v. Constantine, 567 F.2d 266, 267 (4th Cir.1967)). "While the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion [to conduct a Terry stop], an area's propensity toward criminal activity is something that an officer may consider." United States v. Lender, 985 F.2d 151, 154 (4th Cir.1993) (noting courts' ability to credit practical experience of officers who observe on a daily basis what transpires on the street). Officer Dull testified to the extraordinary crime rate in the Spring Hill area over the first three months of the year. He was familiar with that crime wave at the time of the arrest from personal experience. Additionally, he knew on March 26, 1992 of Wolfe's activities in the area that could reasonably be regarded as suspicious.
 
 
 17
 In United States v. Haye, 825 F.2d 32, 34 (4th Cir.1987), we held that the flight from identifiable police officers of two defendants who exhibited drug courier characteristics "gave the policemen reasonable, articulable suspicion, based upon objective facts, quite sufficient to warrant a Terry stop." In the instant case, Dull testified that he had reason to suspect Wolfe of involvement in drug transactions as a gun man or enforcer. Gause testified that, from his observations of Wolfe's behavior both outside and inside the corner market, he believed him to be either armed or concealing drugs. Both officers observed Wolfe attempting to avoid the immediate presence of identifiable police officers. Under Lender, 985 F.2d at 154, "[e]vasive conduct, although stopping short of headlong flight, may inform an officer's appraisal of a streetcorner encounter."
 
 
 18
 Wolfe has contended that Dull used unreasonable force when he "ambushed Wolfe from behind," barely taking the time to identify himself as a police officer. Dull testified that he approached Wolfe on Wolfe's blind side. Wolfe could not see Dull coming because the hood of his sweatshirt obscured his peripheral vision. Dull grabbed Wolfe's hands as he identified himself because he thought Wolfe was armed. Wolfe has not alleged any injuries caused by Dull's encounter. Dull did not act unlawfully, he used a minimal amount of force to protect himself, and there is no showing that the force used was unreasonable given the circumstances and Officer Dull's suspicions.
 
 
 19
 After an officer makes a Terry stop, the officer must have a reason to think that the suspect is armed and dangerous in order to conduct a frisk. In his police report the night of the arrest, Dull explicitly noted that the high incidence of recent shootings and handgun recoveries in the area motivated his decision to frisk Wolfe. In Maryland v. Buie, 494 U.S. 325, 334-35 n. 2 (1990), however, the Supreme Court wrote that "[e]ven in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk for weapons can be conducted." Dull had three grounds for such suspicion. First, Officer Dull testified that he had reason to believe from informants and personal observations that Wolfe was acting as a gun man for a drug operation. Second, as Officer Dull approached Wolfe to stop him for questioning, Wolfe was walking away from the area very quickly with both hands in his pockets. His posture indicated to Dull that he may have been concealing a weapon. Finally, and most importantly, Officer Dull testified that he felt the hard object beneath Wolfe's jacket as he grabbed Wolfe's hands and knew immediately that it was a shotgun.
 
 
 20
 Under Moore, 817 F.2d at 1107-08, the officer conducting the stop is not required to ask even one question between the time he stops and the time he frisks the suspect. Officer Dull felt the shotgun at the same time he attempted to stop Wolfe. He knew immediately that Wolfe was carrying a concealed weapon and placed him under arrest.
 
 
 21
 In United States v. Sinclair, 983 F.2d 598, 603 (4th Cir.1993), we noted that an "officer's reasonable belief [that a particular suspect is armed and dangerous] may derive as much from his experience in similar cases as from his precise knowledge of the dangerous propensities of the suspect at hand." Officer Dull testified to a twelve-year history with the police force and extensive experience investigating similar drug operations.
 
 
 22
 Both the stop and the frisk at issue in the instant case were conducted legally. The district court justifiably relied on credibility determinations in its decision upholding the legality of the officers' conduct. The judge did not make any clearly erroneous findings of fact.
 
 
 23
 B. The Judge's "Leading" Questions and His Understanding of His Own Authority
 
 
 24
 Wolfe has made two additional claims of error concerning the suppression hearing: 1) the judge asked Officer Dull inappropriate, leading questions, and 2) the judge misunderstood his own authority.
 
 
 25
 Drawing attention to the supposed discrepancies between the report Dull filed on the night of the arrest and the testimony he gave at the suppression hearing, Wolfe has argued that the judge's factual finding that "Mr. Wolfe looked like he was acting as an enforcer for a drug organization is clearly erroneous because the testimonial basis for that finding emerged only after the court asked the witness a series of leading questions."
 
 
 26
 Wolfe has cited Pollard v. Fennell, 400 F.2d 421, 424 (4th Cir.1968), in support of his contention that the district judge's line of questioning was inappropriate. Pollard, however, is inapposite. In Pollard we held that the defendants were entitled to a new trial because the judge had asked leading questions, "acting, not as a disinterested prober for the truth, but as an advocate and, in addition, [had acted] as a witness," creating a record from which we inferred that the judge unduly favored the plaintiffs. Pollard, 400 F.2d at 424. The leading questions in Pollard were objectionable primarily because the case was tried before a jury "and the impact of a question by the court on both the witness and the jury ... should not be underestimated." Id.
 
 
 27
 In the instant case, the judge asked questions at a suppression hearing. A jury was not involved in the proceedings. In addition, the judge asked Dull only clarifying questions; he did not testify as a witness, and his questions did not rise to the level of testimony from the bench. Following the direct and cross examinations of Officer Dull, the court asked a series of questions to develop Dull's experience with similar drug operations and his background.
 
 
 28
 The defense lawyer had pointed out apparent discrepancies between the report Dull filed on the night of the arrest and his testimony at the hearing. The judge attempted to clarify those discrepancies by asking what, specifically, Officer Dull meant when he wrote that Wolfe had been "loitering" in the area. The judge described two different kinds of loitering, one aimless and one more purposeful, and asked Dull which of those he had in mind when he wrote the report. "Did it appear to you that Mr. Wolfe was simply walking aimlessly about, or did he appear to be--have his antenna raised so to speak?" If a leading question suggests the desired answer to the witness, the judge's question possibly could be described as such. Even so, however, it would be a close call as to whether the question was leading, because the judge actually gave Dull two options. Clearly, Dull chose the option more consistent with his previous testimony, but he went on to support his choice with further observations he made on the night of the arrest.
 
 
 29
 Under Federal Rule of Evidence 614(b), the court may interrogate witnesses whether called by itself or by a party. In United States v. Seeright, 978 F.2d 842, 847 (4th Cir.1992), we cited the Supreme Court's statement in Glasser v. United States, 315 U.S. 60, 82 (1942), that "a trial court may ask questions of witnesses to bring out needed facts or [to] clarify the presentation of issues." The district judge in the instant case had to rule on the defendant's motion to suppress. To do so, he had to reconcile the evidence presented to him by the parties. The evidence included both the initial police report and the officers' testimony. The judge asked only those questions necessary to reconcile the two accounts. Contrary to Wolfe's assertion, the questions the judge asked and the information he elicited did not render his subsequent findings of fact erroneous. They reduced an incompleteness in the testimony. They did not reveal a contradiction therein.
 
 
 30
 Finally, Wolfe has argued that the judge's acceptance of Dull's testimony was clearly erroneous because the court misunderstood its role in assessing witness credibility by accepting the officers' testimony only because Wolfe as defendant failed to put on evidence about what he was doing in the area. Specifically, Wolfe has contended that the court did not know that it had the authority to reject Dull's testimony based on the material omissions in his police report and his statement of charges.
 
 
 31
 Wolfe's argument is clearly refuted by the comments the judge made during the proceedings. In order to accept Wolfe's theory of the case, the district judge explained that he had either 1) to find that the Officers' testimony at face value was insufficient, or 2) to reject significant portions of their testimony. The judge continued that, given the testimony at the hearing, the only reasons he would have to reject significant parts of the Officers' testimony would be 1) inconsistencies between their two versions; 2) inconsistencies with the report in the grand jury testimony; or 3) inconsistency between those two pieces of evidence and the testimony at the hearing.[6] The district judge went on to state that Wolfe's theory would have been more convincing had he produced witnesses to testify to what he was doing on the street corner and to contradict the Officers' testimony. Ultimately, the judge simply felt that Dull's testimony was credible, and that the incompleteness of or omissions in his report were understandable. Wolfe's contention that the district judge did not understand the nature of his own authority is without merit.
 
 
 32
 II. The Legality of Sentencing GuidelineSec. 2K2.1
 
 
 33
 The district court's ruling that Sentencing Guideline Sec. 2K2.1 was promulgated lawfully by the Sentencing Commission is subject to de novo review. United States v. Daughtrey, 874 F.2d 213, 218 (4th Cir.1989); United States v. Galloway, 976 F.2d 414, 419 (8th Cir.1992), cert. denied, 113 S.Ct. 1420 (1993).
 
 
 34
 Wolfe has argued that Sec. 2K2.1(a)(1)-(4), governing sentencing of firearms offenders, exceeds the scope of the Commission's enabling legislation because that subsection allows the nature of the defendant's prior felony convictions to increase his base offense level. Subsections 2K2.1(a)(1) and (2) increase the base offense level for offenders with two prior crimes of violence or drug offenses, and subsections 2K2.1(a)(3) and (4) increase the base offense level somewhat less for offenders with only one prior crime of violence or drug offense.
 
 
 35
 When Wolfe challenged the legality of Sec. 2K2.1 below, the district court ruled as follows:
 
 
 36
 I find that it is permissible under the statutory framework under which the guidelines were adopted for the offense level to be calculated with respect to the prior criminal record in an instance such as this in which the crime of offense is a status offense that relates back to the prior criminal record.... [I]t is certainly rational for the Sentencing Commission, taking everything into consideration, to determine that a felon in possession offense is more serious, presents a greater risk of danger to the community when the individual who is a felon who possesses a firearm has a prior record, a felony that includes these violent or handgun offenses, and therefore I reject the argument that the guideline in this respect was enacted illegally.
 
 
 37
 The plain language of 28 U.S.C. Sec. 994(c) supports the district court's reasoning.[7] That provision explicitly allows the Sentencing Guidelines Commission to consider factors other than those enumerated in the statute.
 
 
 38
 The Commission, in establishing categories of offenses for use in the guidelines ... shall consider whether the following matters, among others, have any relevance to the nature [or] extent ... of an appropriate sentence....
 
 
 39
 28 U.S.C. Sec. 994(c). "The open-ended language 'among others' invites the Commission to consider sentencing factors that Congress failed to specifically list." Galloway, 976 F.2d at 420. The statute is explicitly non-exclusive, and makes no specific exceptions to the directive.[8]
 
 
 40
 The government has described Sec. 2K2.1 as a provision simply governing the continuum of Sec. 922(g) violations committed by individuals who have committed at least one prior felony. Within that continuum, the government has contended correctly that Sec. 2K2.1 establishes an "incremental adjustment schedule that serves to advance the Guidelines' fundamental goal of proportionality in sentencing." United States v. Ellen, 961 F.2d 462, 468 (4th Cir.), cert. denied, 113 S.Ct. 217 (1992) (rejecting the argument that imposition of an upward adjustment for an offense characteristic also included in the base offense level constituted double counting).[9] In a related argument, Wolfe has asserted that Sec. 2K2.1(a)(1)-4) contravenes the Firearms Act, 18 U.S.C. Secs. 921-930. Section 922(g) lists those persons who are prohibited from possessing a firearm, including persons who have been convicted of a crime punishable by imprisonment for a term exceeding one year. 18 U.S.C. Sec. 922(g)(1). Wolfe has contended that the Sentencing Commission has no basis to distinguish among those individuals with felony convictions. The argument is that "[C]ongress did not decide to draw distinctions between the fraud felon who possesses a firearm and the drug felon.... In essence, the Sentencing Commission has adopted a wholly different view than Congress on how firearms offenses should be categorized and graded." Wolfe has gone on to assert that "[t]here is nothing inherently more dangerous about a person who possesses a firearm after having been convicted of a robbery for stealing a pack of cigarettes than the person who possessed the firearm after having been convicted of a multi-million dollar mail fraud." Wolfe leaves out the descriptive "armed" before robbery in describing his previous conviction. The fact that he stole only a pack of cigarettes during the course of that armed robbery does not begin to negate or mitigate the danger in which he placed his victims by wielding a weapon. The overall gist of Wolfe's assertion simply does not hold water.
 
 
 41
 We reject Wolfe's challenge to the legality of Sec. 2K2.1 on the merits and accordingly his sentence is hereby
 
 
 42
 AFFIRMED.
 
 
 
 [1]
 From January through March 26 of 1992, the two block area experienced: 14 robberies, 5 burglaries, 16 aggravated assaults, 3 larcenies from automobiles, 1 homicide, 4 handgun arrests, 49 drug arrests, and 18 other arrests. Dull testified that although he knew from personal experience that he was working a high crime area, he did not obtain the above statistics until after Wolfe's arrest
 
 
 [2]
 Although the government portrayed these as "known" trafficking locations, neither officer's testimony clearly supported the government's interpretation. Dull testified that 2903 was either "known or suspected" and that the police "received information that they were possibly selling drugs out of that grocery store," in reference to the Spring Hill Market. Gause testified that they had received specific complaints on 2903 from "anonymous citizens."
 
 
 [3]
 According to the testimony of Officer Dull, a "gun man" protects the drug house or the dealer if he happens to be working on the street. The gun man follows the dealer and monitors his activities. A gun man can carry any of a variety of guns from a Saturday Night Special to a shotgun or semi-automatic depending on the organization's span and resources
 In response to questions from the court, Dull indicated that he had received information from unidentified people whom he had arrested and from members of the Northwest Drug Unit that there might be a gun man at 2903 Spring Hill Avenue or in the area. Dull was also aware of intergang rivalry or friction between the "New York element" and the "local element."
 
 
 [4]
 On cross-examination, Dull indicated that he neglected to put a full account of his suspicions in the police report because he was tired and wet
 
 
 [5]
 Officer Dull did not need a particularized suspicion that Wolfe was armed and dangerous in order to stop him for questioning. To stop him for questioning under Terry, Dull needed only a reasonable and articulable suspicion that Wolfe was engaged in criminal activity. Consistent with Terry and not inconsistent with any Fourth Circuit precedent, an officer can develop a suspicion that a suspect is armed and dangerous after he stops the individual. Although Dull had reason to believe that Wolfe might be armed before he stopped him in the intersection, in any event Dull testified that he felt the shotgun immediately when he attempted to stop Wolfe for questioning. Dull's perception of the weapon led to Wolfe's arrest
 
 
 [6]
 It is evident that the district judge knew he could reject the officer's testimony if he did not find it credible
 
 
 [7]
 Although appellee has argued that the Sentencing Commission, as an agency, is entitled to Chevron deference, we need not address that issue, as Wolfe's argument is wholly meritless under any standard of review, deferential or not
 The Fourth Circuit has not addressed directly and need not here resolve the question of whether decisions of the Sentencing Commission should be given the deference required by Chevron. The appellee is correct that the Sentencing Commission acts as an agency. In Mistretta v. United States, 488 U.S. 361, 396 (1989), the Supreme Court described the Sentencing Commission as an "independent agency charged with the promulgation of sentencing guidelines...." Several circuit courts, other than the Fourth, have, moreover, applied Chevron deference in reviewing claims that the Commission contradicted or exceeded its enabling statute. "We may set aside the guideline, therefore, only if it contravenes an 'unambiguously expressed intent of Congress' or is unreasonable." United States v. Shabazz, 933 F.2d 1029 (D.C.Cir.), cert. denied, 112 S.Ct. 431 (1991) (citing Chevron in decision upholding district court's application of 21 U.S.C. Sec. 841(b)(1)(c) and sentencing guideline Sec. 2D1.1(a)(3)). Accord, United States v. Galloway, 976 F.2d 414 (8th Cir.1992), cert. denied, 113 S.Ct. 1420 (1993) (applying Chevron standard when considering the Commission's construction of the statutory scheme it administers); United States v. Harper, 932 F.2d 1073, 1077 (5th Cir.), cert. denied, 112 S.Ct. 443 (1991) (upholding Sentencing Commission's promulgation of Section 2J1.6 as a "rational sentencing choice ... within the parameters of applicable statutes ..." by applying Chevron); United States v. Martinez-Cortez, 924 F.2d 921 (9th Cir.1991) (applying Chevron to uphold Commission's interpretation of 18 U.S.C. Sec. 3561 as "sufficiently reasonable"); United States v. Lewis, 896 F.2d 246 (7th Cir.1990) (applying Chevron to hold that Section 5K1.1 reflects a reasonable interpretation of Sec. 994(n)'s mandate).
 
 
 [8]
 Wolfe has noted that Sec. 994(d), describing the factors the Commission should consider in constructing categories of defendants, mentions criminal history explicitly. He has suggested that Congress's failure to include criminal history as a factor under Sec. 994(c), in light of the inclusion of criminal history under Sec. 994(d), means that Congress did not intend the Commission to consider criminal history in its formulation of base offense levels. Under Wolfe's theory, the sentence of a defendant with a criminal history could be enhanced under U.S.S.G.Sec. 4A1.1(e), but not under both Sec. 4A1.1(e) and Sec. 2K2.1. Appellant's argument on that point is not persuasive. It should be noted that the district judge found the criminal history to be overstated as a result of the application of Sec. 2K2.1 and Sec. 4A1.1(e). Under Sec. 4A1.3, the judge exercised his discretion to depart downward by one level
 
 
 [9]
 Wolfe has argued that the court should apply the rule of lenity. Wolfe has offered the dissenting opinion in Galloway, 976 F.2d at 428 to support his position
 The rule of lenity, however, is not applicable. Section 994 is clear on its face, and therefore the rule of lenity need not be invoked. The rule of lenity is a principle of statutory construction providing that a court "must 'not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended.' " United States v. Collar, 904 F.2d 441, 442 (8th Cir.1990) (citations omitted). What Congress intended, however, is not the issue in the instant case. Rather, the issue is whether the Sentencing Commission's interpretation of the congressional mandate is sound. Wolfe did not challenge the validity of the enabling legislation. He challenged the legality of the Commission's interpretation of that legislation.
 Two Fourth Circuit cases have suggested that the rule of lenity applies to the interpretation of the Sentencing Guidelines in the same manner as it applies to the interpretation of criminal statutes. United States v. Blackburn, 940 F.2d 107, 109 (4th Cir.1991); United States v. Osamu, 952 F.2d 827, 830 (4th Cir.1991) (citing Blackburn ). The ultimate authority for both cases, however, is mere dicta from an earlier Fourth Circuit case, United States v. Rivers, 929 F.2d 136, 139 (4th Cir.), cert. denied, 112 S.Ct. 431 (1991). In Rivers, a passage quoted from the district court's order mentions the applicability of the rule of lenity to the guidelines. In Rivers, however, we decided the case on other grounds and made no further mention of the rule of lenity. All three cases dealt with judicial interpretation of the guidelines rather than the Commission's authority to interpret its enabling legislation.
 United States v. Rivera, 996 F.2d 993, 994 (9th Cir.1993), on the other hand, involved a challenge to the Commission's interpretation of its enabling legislation. Rivera held that, in reviewing the Commission's interpretation of the underlying statute, the court must determine whether the Sentencing Guideline is "sufficiently reasonable" in light of the congressional directive to the Commission.