The PEOPLE of the State of Colorado, Plaintiff–Appellant,

v.

Jason CAPPELLI, Defendant–Appellee.

No. 96SA346.

Supreme Court of Colorado,
En Banc.

Nov. 18, 1996.

David J. Thomas, District Attorney, First Judicial District, Donna Skinner Reed, Chief Appellate Deputy District Attorney, Golden, for Plaintiff–Appellant.

Vincent C. Todd, Lakewood, for Defendant–Appellee.

Chief Justice VOLLACK delivered the Opinion of the Court.

In this interlocutory appeal, the People seek review of an order entered by the Jefferson County District Court finding no probable cause for the arrest of the respondent, Jason Cappelli (Cappelli). We reverse the trial court's ruling.

## I.

On March 12, 1996, at approximately 11:00 p.m., Sergeant Stephen White (Sergeant White) of the Lakewood Police Department responded to a dispatch for a grass/brush fire located in a drainage area of open space in the Green Mountain area. Upon arriving at the site, Sergeant White, Agent Mike Monn (Agent Monn), and Agent Richard Halpin (Agent Halpin) found a grass fire which they were able to extinguish. Sergeant White characterized the fire as suspicious in origin because there had been no lightning storms in the area and there were no other obvious causes of the fire. At the same time, another small fire was in progress to the north of the drainage area. That fire was contained and extinguished by members of the Jefferson County Sheriff's Department.

While extinguishing the fire in the drainage area, Sergeant White and the other agents heard a person yelling obscenities at them. The person yelled statements such as "You stupid [expletive] cops" and "You [expletive] will never catch me." These statements caused Sergeant White to believe that the fire had been deliberately set by the person making the statements. The person continued to yell at the agents, with his voice coming from different locations at different times. Agent Monn, who had previous contact with Cappelli, thought that the voice sounded like that of Cappelli. Although Agent Monn attempted to establish a dialogue with the person by calling out Cappelli's name, the person did not respond.

Additionally, Sergeant White and the other agents had become familiar with Cappelli's name at their roll call earlier that day, when they were informed that Cappelli had been arrested in connection with other fires and that Cappelli was known to have threatened to cause fires. Sergeant White testified that Cappelli's name came to his mind while he was extinguishing the fire and that he knew Cappelli lived approximately one-half to three-quarters of a mile from the fire. The agents thus aired information that Cappelli was a suspect in this potential arson.

After Sergeant White and the other agents extinguished the fire, they began to search for the person who continued yelling at them. Agent Mike Greenwell (Agent Greenwell) joined in the search effort with a trained K–9 tracker. The agents searched for approximately two hours without success. The yelling became sporadic, and they lost contact with the voice completely for approximately one hour. The K–9 tracker lost the scent and the agents engaged in "sweeps" of the ravines and gullies in the area in the last hour of their search.

While the agents were searching on the mountain, other law enforcement units established a perimeter below. One or more units had established surveillance of Cappelli's home, but no one observed Cappelli pass through the perimeter. During their last minutes on the mountain, the agents received radio information that a suspicious party had been seen in the back yard of a residence located within one-half to three-quarters of a mile from the search area.

Agent Carol Rosenoff (Agent Rosenoff) testified that she and another agent responded to the radio call of the suspicious person in the back yard of the residence. When she and the other agent came around the corner of a residence at 71 Wright Court, a person jumped up from behind a planter and ran away. The person had dark brown hair and was wearing a brown leather jacket and blue jeans. Agent Rosenoff was unable to make an identification of the person at that point. Although Agent Halpin told the person to "freeze," the suspect did not respond to the command and escaped by jumping over a gate, dropping down to a hilly area, and running to a clearing at the bottom of the hill.

Within twenty seconds of this encounter, the pilot of a Jefferson County helicopter that had joined the search illuminated a per-

son at a nearby Veterans' Administration (VA) Building. Agent Rosenoff proceeded to the VA Building and observed a person on the ledge of the building. Agent Rosenoff identified the person on the ledge as the same person she had just encountered near the residence. She also later identified that person as Cappelli.

Agent Greg Sloter (Agent Sloter) responded to the VA Building, and he was accompanied by a K–9 dog trained to assist in the control and apprehension of humans.[1] After Cappelli made a series of evasive moves on the ledges of the VA Building, Cappelli, Agent Sloter, and the dog ended up on the roof of the building. Agent Sloter, who was in full uniform, warned Cappelli by stating, "Stop what you're doing or I'll send the dog." Cappelli responded by throwing his leather jacket off the roof, taking an aggressive fighting stance with his fists up, and telling Agent Sloter to "[s]end the dog." As the individuals advanced toward each other, the leashed dog lunged and bit Cappelli on his chest. Cappelli struck the dog, then ran to the edge of the roof and threatened to jump. Cappelli jumped down to a ledge, then submitted to custody.

Upon a search of the brown leather jacket which Cappelli had thrown off the roof, agents found a cigarette lighter. Cappelli was taken to the hospital where he was given an injection, presumably for the dog bite. Cappelli was subsequently taken to the Jefferson County Detention Facility, where he entered the booking process at 2:50 a.m. on the morning of March 13, 1996. At that time, Agent Damian Cappello (Agent Cappello) advised Cappelli of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Upon the completion of the *Miranda* advisement, Cappelli agreed to talk to law enforcement personnel. When asked why he started fires and stayed around to harass police officers, Cappelli responded, "That's what I do." Cappelli also admitted that he was the person yelling at Sergeant White and the other agents while they were extinguishing the fire in the drain-

age area. Later, when Cappelli heard one officer tell another officer that Cappelli was being charged with second degree arson, Cappelli volunteered, "Why are they charging me with second degree arson this time? Last time I started a brush fire, they only charged me with fourth degree arson."

Cappelli was subsequently charged with criminal attempt second degree assault, resisting arrest, obstructing a peace officer, second degree arson, fourth degree arson, and second degree criminal trespass. On September 4, 1996, the district court held a hearing to resolve issues raised by Cappelli's motion to suppress. The district court ruled that the law enforcement officers did not have probable cause to arrest Cappelli and therefore suppressed: (a) all statements made by Cappelli as a result of interviews conducted after the arrest; and (b) the cigarette lighter obtained as a result of the search incident to the arrest. The People subsequently filed this interlocutory appeal.

## II.

█ To be valid, a warrantless arrest must be supported by probable cause. *People v. Washington*, 865 P.2d 145, 147 (Colo. 1994). Probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to support a reasonable belief that a crime has been or is being committed by the person arrested. *Id.* In determining whether there is probable cause to arrest, the totality of circumstances known to the officer at the time of arrest must be considered. *Id.* As the term suggests, probable cause deals with probabilities, not certainties, and it is sufficient if the officer reasonably believed that the person arrested committed a crime. *Id.* Although we will not ordinarily disturb a trial court's finding that probable cause to arrest was lacking, we will do so when the record compels the conclusion that probable cause to arrest existed. *Id.*

█ Even if police officers do not have probable cause to arrest when they stop an

---

1. In another case, Agent Sloter and the same dog had given chase to Cappelli and the dog had bitten Cappelli.

individual, they may acquire probable cause to arrest if the individual commits other crimes while attempting to elude them. *See People v. Smith,* 870 P.2d 617, 619 (Colo.App. 1994). In *Smith,* the police were searching a neighborhood for a male suspect on a motorcycle. A police officer engaged in the search observed a passing Cadillac with a broken rear window. The officer believed that the person the police were looking for might have abandoned the motorcycle and stolen the Cadillac. Accordingly, the officer activated his emergency lights in an attempt to pull the Cadillac over, but the vehicle sped off. The Colorado Court of Appeals held that even if the officer had unlawfully tried to stop the defendant, the defendant's response in attempting to elude the officer constituted new, distinct crimes for which there was probable cause to arrest. *Id.*

■■■ The issue before us is whether law enforcement personnel had probable cause to arrest Cappelli without a warrant under the circumstances of this case. While the agents were extinguishing the fire in the drainage area, a person yelled obscenities such as "You [expletive] will never catch me," which indicated to Sergeant White that the person had deliberately caused the fire. According to Agent Monn, who had previous contact with Cappelli, the yelling person's voice sounded like that of Cappelli. Agent Monn's identification of the voice, the agents' information that Cappelli was suspected of causing previous fires, and the close proximity of Cappelli's residence to the current fire caused the agents to air Cappelli's name as a suspect in this case. When Agent Rosenoff and Agent Halpin encountered Cappelli late at night [2] after hearing his name aired as a suspect for arson, they had reasonable suspicion to conduct an investigatory stop. *See People v. Contreras,* 780 P.2d 552, 555 (Colo. 1989) (holding that only reasonable suspicion is necessary to support an investigatory stop).[3] However, before the agents could stop Cappelli, he ran away despite being told to "freeze."

After eluding the agents, Cappelli climbed over a six foot fence and climbed to the roof of a VA Building. There, he encountered Agent Sloter and assumed an aggressive fighting stance. Cappelli then attempted to run away once more by jumping off the roof to a ledge below. These actions by Cappelli provided Agent Sloter with a reasonable belief that, at a minimum, Cappelli had (a) trespassed, (b) committed criminal attempt second degree assault, and (c) resisted arrest. Thus, the facts and circumstances here were sufficient to support a reasonable belief by Agent Sloter that Cappelli had committed various crimes while attempting to run away, thereby providing probable cause to arrest Cappelli. *See Smith,* 870 P.2d 617.[4]

## III.

We hold that based on the totality of the circumstances of this case, the record compels the conclusion that the agents had probable cause to arrest Cappelli. We therefore reverse the district court's order suppressing the statements Cappelli made after the arrest and the cigarette lighter found in Cappelli's jacket.

---

**2.** According to the timing in this case, it appears that the agents encountered Cappelli at approximately 1:00 a.m.

**3.** In *Contreras,* we held that a constitutional investigatory stop requires that (a) there is an articulable and specific basis in fact for suspecting that criminal activity has taken place, is in progress, or is about to occur; (b) the purpose of the intrusion is reasonable; and (c) the scope and character of the intrusion is reasonably related to its purpose. *Contreras,* 780 P.2d at 555.

**4.** Moreover, the circumstances of this case are more compelling than those of *Smith* because here, Cappelli attempted to elude law enforcement personnel after they attempted a *lawful* investigatory stop based on reasonable suspicion.