**The PEOPLE of the State of Colorado,**
**Plaintiff–Appellant,**

v.

**Jesse ARCHULETA, Defendant–Appellee.**

**No. 98SA356.**

Supreme Court of Colorado,
En Banc.

March 8, 1999.

A. William Ritter, Jr., District Attorney, Second Judicial District, Nathan B. Coats, Chief Appellate Deputy District Attorney, Denver, Colorado, Attorneys for Plaintiff–Appellant.

David F. Vela, Colorado State Public Defender, Angela Kruse, Deputy State Public Defender, Kathleen Lord, Deputy State Public Defender, Denver, Colorado, Attorneys for Defendant–Appellee.

Justice KOURLIS delivered the Opinion of the Court.

This case comes before us on interlocutory appeal from a trial court order suppressing evidence in a drug prosecution. Because we conclude that under the circumstances of this case, a police officer's actions in chasing the defendant and then approaching him with his gun drawn did not offend the Fourth Amendment, we reverse the trial court order.

### I.

On the evening of May 10, 1998, Officer Daniel Felkins of the Denver Police Department was in his marked vehicle patrolling the area surrounding the 2100 block of Larimer Street in Denver between 10:00 p.m. and 11:00 p.m. The officer noticed three men "huddled together" in the dark alley by the back door of the El Charrito bar. Officer Felkins testified that because the area is known for illicit drug activity, he suspected that these individuals might be engaged in a drug transaction.[1]

Acting on this general suspicion, Officer Felkins circled around once, saw the men again, parked his car, and approached them. Upon seeing the officer, one of the men in the group, Jesse Archuleta, took off running.

Officer Felkins chased Archuleta, who ran up 21st Street toward Market Street, up the alley between Larimer Street and Market Street and then back down Larimer Street to the front door of the El Charrito. As he ran into the bar, he knocked over a bicyclist who was in the entryway.

Officer Felkins followed Archuleta into the building. He asked a person in the bar where Archuleta had gone. The person pointed to the dining area at the back of the restaurant, which was not occupied by patrons at that time. Officer Felkins drew his gun and proceeded toward that area to look for Archuleta. He eventually found him hiding under some tables in the dining area.

With his weapon still drawn, Officer Felkins asked the suspect why he had been running. Archuleta replied that there were warrants outstanding for his arrest. After hearing that response, Officer Felkins detained Archuleta, and with the help of another officer pulled him out from under the tables. When Archuleta stood, the officer observed two baggies of a substance that he suspected to be heroin on the floor where Archuleta had been lying. The police subsequently searched the dining area and found a handgun under a table near where they apprehended Archuleta.

After Officer Felkins seated Archuleta in a patrol car, he told Archuleta that he was a fast runner and commented to him that he should have been an athlete instead of a drug dealer. Archuleta responded with an apparent reference to the baggies, saying that he was just holding them for a friend.

Archuleta was charged with possession of a controlled substance and possession with intent to distribute a controlled substance in violation of sections 18–18–405(1)(a) and 2(a)(I), 6 C.R.S. (1998), and as a special offender under section 18–18–407(1)(f), 6 C.R.S. (1998). Archuleta pled not guilty and filed a motion to suppress all of the evidence against him, alleging that it was the product of an illegal seizure in violation of the Colorado and United States Constitutions. The trial court granted the motion to suppress,

---

1. The trial court agreed with the officer's characterization of the area as a common forum for drug transactions. The court took judicial notice that the 2100 block of Larimer Street "is a notorious location for drug dealing."

and the matter now comes before us as a result of the prosecution's interlocutory appeal pursuant to C.A.R. 4.1.

We conclude that Archuleta's comment regarding his outstanding warrants was evidence produced in the course of a valid investigatory stop. That comment then provided Officer Felkins with a sufficient reason to detain Archuleta. The police subsequently seized the bags of heroin and the gun as a result of Archuleta's lawful detention.

## II.

■ The Fourth Amendment to the United States Constitution and Article II, Section 7, of the Colorado Constitution protect against unreasonable searches and seizures. *See* U.S. Const. amend. IV; Colo. Const. art. II, § 7; *see also, e.g., People v. Salazar,* 964 P.2d 502, 504 (Colo.1998). The determination of whether a search or seizure is reasonable depends upon the reason for and the extent of the intrusion. *See, e.g., Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

■ In determining whether a particular encounter between the police and a citizen violates the Fourth Amendment, it is helpful to classify the incident as one of three general types of police-citizen contact: consensual encounters; arrests or full-scale searches; or intermediate forms of intrusion such as investigatory stops or limited searches. *See Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991); *Salazar,* 964 P.2d at 506; *People v. Johnson,* 865 P.2d 836, 842 (Colo.1994); *People v. Tate,* 657 P.2d 955, 958 (Colo.1983). Consensual encounters are those in which the police approach a person to ask questions or request identification. They do not trigger Fourth Amendment scrutiny "so long as a reasonable person would feel free 'to disre-gard the police and go about his business.'" *Bostick,* 501 U.S. at 434, 111 S.Ct. 2382 (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991)); *Johnson,* 865 P.2d at 841. Arrests and full-scale searches, on the other hand, are subject to the Fourth Amendment's reasonableness requirement. In order to be constitutionally sound, they must be based on warrants issued upon probable cause or on an established exception to the warrant requirement. *See, e.g., Salazar,* 964 P.2d at 504.

■ In the middle of the spectrum between consensual encounters and arrests based upon probable cause exist "intermediate forms of police response" that "may be employed under narrowly defined circumstances upon less than probable cause." *Tate,* 657 P.2d at 958. Police may undertake intermediate intrusions such as investigatory stops [2] consistent with the Fourth Amendment as long as three conditions are satisfied: (1) there is a specific and articulable basis in fact for suspecting that criminal activity has taken place, is in progress, or is about to occur (that is, "reasonable suspicion"); (2) the purpose of the intrusion is reasonable; and (3) the scope and character of the intrusion are reasonably related to its purpose. *See Salazar,* 964 P.2d at 505.

At the motions hearing before the trial court, Archuleta contended that Officer Felkins's pursuit of him constituted an investigatory stop, that it was conducted in violation of the Fourth Amendment, and therefore that the trial court should suppress any evidence discovered as a result of that chase. First, Archuleta argued that at the time the foot chase began, Officer Felkins did not have an articulable suspicion of criminal activity.[3] Moreover, Archuleta asserted that his subsequent act of running away to avoid

---

2. An investigatory stop is an encounter in which an officer conducts a limited search in order to question a suspect or pat him down for weapons. The United States Supreme Court first recognized that such a seizure can be based on less than probable cause in *Terry,* 392 U.S. at 30, 88 S.Ct. 1868. In Colorado, such stops are sometimes referred to as *Stone* stops pursuant to *Stone v. People,* 174 Colo. 504, 485 P.2d 495 (1971).

3. Officer Felkins testified that he formed the impression that Archuleta and the other two men were involved in a drug deal because: (1) they were in an area known for drug trafficking; and (2) they were huddled together. The People conceded that those facts did not rise to the level of a reasonably articulable suspicion to stop Archuleta at the time the chase began. We therefore do not address the issue.

contact with the police officer "[did] not constitute the type of specific and articulable fact that is constitutionally sufficient to justify a stop." *People v. Thomas,* 660 P.2d 1272, 1275 (Colo.1983). Thus, Archuleta continued, Officer Felkins's non-consensual contact with Archuleta at the end of the chase was not supported by facts sufficient to satisfy the requirements of the Fourth Amendment. Accordingly, Archuleta's statement regarding his outstanding warrants, his resulting arrest, the discovery of the drugs and the gun, and his subsequent incriminating statement were all inadmissible fruits of the improper contact. The trial court agreed and granted Archuleta's motion to suppress the evidence. We now reverse.

### III.

In order to reach a conclusion regarding the admissibility of the evidence, we must first determine the nature of the contact between Officer Felkins and Archuleta. We then apply the test applicable to that type of contact to the facts in this case in order to analyze whether Officer Felkins's actions were justifiable and appropriate under the Fourth Amendment.

■ Here, when Officer Felkins drew his weapon and approached Archuleta in the dining area, his actions constituted a seizure for purposes of the Fourth Amendment. *See United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.) (stating that "the display of a weapon by an officer" was an example of a seizure). We now conclude that this seizure was an investigatory stop rather than an arrest, and that under the totality of the circumstances, this investigatory stop was a reasonable seizure that did not violate Archuleta's rights under the Fourth Amendment.

### A.

The United States Supreme Court has never clearly differentiated between the characterization of seizures as arrests as opposed to investigatory stops. However, as the Seventh Circuit has noted, the trend developing since *Terry* has been to include within the rubric of investigatory stops in some circumstances "the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *United States v. Tilmon,* 19 F.3d 1221, 1224–25 (7th Cir.1994), *quoted in* 4 Wayne R. LaFave, *Search and Seizure* § 9.2(d) at 36 (3d ed.1996).

■ A law enforcement officer conducts an investigatory stop because he suspects an individual of criminal activity and deems it necessary to take action in order protect himself and those around him. *See Terry,* 392 U.S. at 30, 88 S.Ct. 1868. It is logical, then, to conclude that in the course of conducting an investigatory stop, an officer may take reasonable measures necessary to ensure his own safety. *See United States v. Hensley,* 469 U.S. 221, 235, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985) (noting that in the course of an investigatory stop, police officers "were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop"); *Tilmon,* 19 F.3d at 1225 ("When effecting a *Terry* stop, which is always a stop made at 'close range,' police officers must make a quick decision about how to protect themselves and others from possible danger."). In this case, Officer Felkins testified that he drew his gun when he entered the dining area. He believed Archuleta was probably hiding in that area. The area was deserted. The officer could reasonably have harbored concerns for his safety under the circumstances. It was not unreasonable for Officer Felkins to have drawn his gun in preparing to confront Archuleta and any unknown circumstances that had enticed Archuleta to return to the very bar from whose alley he fled. Officer Felkins's action in drawing his weapon did not constitute an arrest, but was merely a justifiable measure of precaution ensuring his protection in the course of conducting an investigatory stop. *See United States v. Diaz–Lizaraza,* 981 F.2d 1216, 1221 (11th Cir.1993) (finding that an investigatory stop of suspected drug dealers did not become an arrest merely because agents drew their guns, and

reasoning that drug dealing is known to be extremely violent and the agents acted reasonably to protect themselves); *United States v. Sinclair*, 983 F.2d 598, 602–03 (4th Cir.1993) (concluding that police officers could properly draw guns incident to the investigatory stop of suspected drug carriers); 4 LaFave, § 9.2(d) at 37 ("[I]t cannot be said that whenever police draw weapons the resulting seizure must be deemed an arrest rather than a stop. . . . The courts have rather consistently upheld such police conduct when the circumstances . . . indicated that it was a reasonable precaution for the protection and safety of the investigating officers.").

## B.

■■■ Having concluded that the encounter constituted an investigatory stop, we must now determine whether the stop was justifiable and appropriately conducted. We begin with whether the officer had a specific and articulable basis in fact for suspecting that criminal activity had taken place, was in progress, or was about to occur at the moment when he approached Archuleta inside the El Charrito. In making this determination, we look to the totality of the circumstances. *See People v. Canton*, 951 P.2d 907, 910 (Colo.1998).

In *People v. Thomas*, 660 P.2d 1272 (Colo. 1983), we held that in a chase case, reasonable suspicion had to be evaluated at the point at which a suspect begins to run. If the officer did not then have a reasonable suspicion of criminal conduct, the chase was unwarranted. Accordingly, we concluded

that "[f]acts uncovered after a chase begins do not enter into the constitutional equation for reasonable suspicion."[4] Because the police in that case did not have a reasonable suspicion of criminal activity before they began to chase the defendant, the evidence of drug use or distribution that the defendant discarded during the course of the pursuit was the product of unlawful police activity, and therefore was not admissible against the defendant. *See id.* at 1275.

Since we issued that opinion, however, the United States Supreme Court has further developed Fourth Amendment jurisprudence in a manner inconsistent with that position.

In *California v. Hodari D.*, the Court held that a police officer's chase of a suspect does not trigger the protections of the Fourth Amendment because it is not a seizure.[5] Applying that conclusion to the facts of *Hodari D.*, the Court found that evidence discarded by a suspect as he was running from the police should not have been suppressed as the fruit of an unlawful seizure because no seizure of the suspect had taken place. *See Hodari D.*, 499 U.S. at 629, 111 S.Ct. 1547.

The Court's conclusion in *Hodari D.* conflicts with part of our decision in *Thomas*. We therefore overrule *Thomas* to the extent that it is inconsistent with the Supreme Court's position in *Hodari D.*[6]

■■■ The application of *Hodari D.* to this case leads us to reject the trial court's conclusion that all evidence discovered subsequent to the police chase was automatically inadmissible merely because Officer Felkins

---

4. *Thomas*, 660 P.2d at 1275. In *Thomas*, two police officers in an unmarked patrol car observed the defendant standing in a parking lot. *See id.* at 1273. After the defendant made eye contact with the officers, he ran away from them into a nearby building. The officers gave chase, and as they followed the defendant into the building, one officer observed the defendant discard something. The officer then drew his gun and ordered the defendant to stop. When that officer discovered that the discarded item was a bunch of balloons containing cocaine, the other officer took the defendant into custody. *See id.* at 1274.

5. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In conclud-

ing that a suspect was not "seized" just because police officers were chasing him, the Court noted that the seizure of a person "requires *either* physical force . . . or, where that is absent, *submission* to the assertion of authority." *Id.* The police in that case had not used physical force against the suspect, and although they made an assertion of authority by pursuing him, the suspect did not cease his attempt to flee. Thus, the suspect had not submitted to law enforcement's assertion of authority, and therefore he had not been "seized" within the meaning of the Fourth Amendment.

6. We applied the holding of *Hodari D.* for the first time in *People v. T.H.*, 892 P.2d 301, 303 (Colo.1995).

did not have a reasonable suspicion of criminal activity when he began the pursuit. Officer Felkins did not need to have reasonable suspicion in order to chase Archuleta because that pursuit was not a seizure and did not trigger the Fourth Amendment.

Hence, we again turn our attention to the moment in the dining area of the El Charrito when the officer approached Archuleta. Under a totality of the circumstances analysis, we must determine whether the officer had a reasonable and articulable suspicion that Archuleta had been or was involved in criminal activity. We conclude that he did.

The facts Officer Felkins knew at the moment of the stop were: (1) the El Charrito was a known drug trafficking location; (2) the defendant and two other individuals were huddled together in an alley in the dark of night; (3) when the officer approached, Archuleta fled; (4) Archuleta continued his flight with deliberate evasive action; (5) he returned to the location from which he fled initially; (6) he knocked over a bicyclist at the entryway of the El Charrito; and (7) he hid himself in a deserted section of the restaurant.

■■■ We have previously held, and we here reiterate, that the fact that a suspect flees from an officer, standing alone, does not support a reasonable suspicion of criminal activity. *See Thomas*, 660 P.2d at 1276. Similarly, the fact that an area is known for drug trafficking, standing alone, does not comprise reasonable suspicion. *See People v. Padgett*, 932 P.2d 810, 815 (Colo.1997) (concluding that the fact that criminal mischief and car break-ins had recently occurred in the neighborhood, though none had been reported that morning or the previous evening, was insufficient to form the basis for reasonable suspicion that two men walking along the street at 1:50 a.m.—one of whom accelerated his pace as police approached—had been involved in criminal activity); *People v. Greer*, 860 P.2d 528, 531 (Colo.1993) (holding that an investigatory stop cannot be based solely on the reputation of past criminal activity in an area).

However, the notion that such circumstances individually cannot constitute reasonable suspicion does not prevent both of them from combining with other developments to form a sufficient basis for reasonable suspicion. We have held, for example, that a history of drug transactions in a locality can provide one element of support for an investigatory stop. *See People v. Ratcliff*, 778 P.2d 1371, 1379 (Colo.1989) (holding that the combination of an observed exchange between two individuals in a high drug-trafficking area together with the officer's prior knowledge of one of the individuals as a user and supplier of drugs sufficed to comprise reasonable suspicion).

■■■ Additionally, continued evasive action that escalates beyond a chase can form one element of a basis for reasonable suspicion. *See People v. Martineau*, 185 Colo. 194, 198, 523 P.2d 126, 127–28 (1974) (determining that the police had reasonable suspicion to stop a defendant who fled from the officer's spotlight at 4:00 a.m. and then tried to hide himself prone at the top of some bleachers)[7]; 4 LaFave, § 9.4(f) at 181 ("[S]uch stops have been upheld when the individual made repeated efforts to avoid police contact, when he engaged in a combination of several different possibly furtive actions, and when the person engaged in a rather extreme means of avoidance such as high-speed flight.") (footnotes omitted).

■■■ Furthermore, the fact that Archuleta knocked over a bicyclist at the entryway to the El Charrito appropriately figures into the calculus for purposes of assessing reasonable suspicion. Assault in the third degree, a misdemeanor, occurs if a person "knowingly or recklessly causes bodily injury to another person or with criminal negligence ... causes bodily injury to another person by means of a deadly weapon." § 18–3–204, 6 C.R.S. (1998). " 'Bodily injury' means physical pain, illness, or any impairment of physical or mental condition." § 18–1–901(c), 6 C.R.S. (1998). Thus, Archuleta may have committed a crime by knocking over the

---

7. We noted in *Martineau* that, once they apprehended the defendant, the police recognized him as having been present at a crime scene earlier that evening. However, they did not recognize him until the stop occurred. *See Martineau*, 185 Colo. at 198, 523 P.2d at 128.

bicyclist. A crime committed while a suspect is fleeing may certainly buttress an officer's suspicions that criminal activity is afoot and may support further investigation. *Cf. People v. Cappelli*, 927 P.2d 832, 834–35 (Colo. 1996) (concluding that if, in the course of fleeing from the police, a suspect commits other crimes, those crimes can be taken into account when assessing the propriety of the officer's conduct upon apprehension of the suspect).

Hence, based upon the totality of the circumstances, the officer had a reasonable and articulable suspicion of criminal activity sufficient to justify the investigatory stop of Archuleta.

Having concluded that the officer did have reasonable suspicion, we now turn to consideration of the other two criteria that must be met in order for an investigatory stop to be valid: whether the purpose of the intrusion is reasonable and whether the scope and character of the stop reasonably relate to its purpose. *See Salazar*, 964 P.2d at 505. The purpose of the stop, to contact Archuleta in order to question his activities at the El Charrito and the reason for his flight, was a reasonable law enforcement objective. *See Terry*, 392 U.S. at 22, 88 S.Ct. 1868 (noting that crime prevention and detection is a legitimate investigative function). In carrying out this purpose, Officer Felkins conducted himself in a manner that allowed him to protect himself until he was able to confirm or dispel his suspicion that Archuleta was involved in criminal activity. When Officer Felkins asked Archuleta a single question in the course of the investigatory stop, specifically, "why are you running?", Archuleta himself provided the answer that gave the officer a further basis to continue the detention, and ultimately, to arrest Archuleta. Thus, the duration of the actual investigatory stop was brief, and its scope was limited to the legitimate purpose of questioning Archuleta's actions.

Upon hearing Archuleta's statement regarding his outstanding arrest warrants,

Officer Felkins acted properly in detaining Archuleta. The gun and the drugs found after the police detained Archuleta were admissible as evidence produced during a search incident to a lawful detention.[8]

### IV.

In sum, we conclude that Officer Felkins's contact with Archuleta in the dining area of the El Charrito was an investigatory stop, which was permissible because at that point, Officer Felkins was aware of facts supporting a reasonable suspicion that Archuleta was engaged in criminal activity. During the course of this reasonable investigatory stop, Archuleta informed Officer Felkins of the outstanding warrants for his arrest, which provided the officer with a basis to detain Archuleta and ultimately arrest him. The subsequent discovery of the heroin and the gun was incident to that lawful detention. Because Officer Felkins acted in conformity with the requirements of the Fourth Amendment, Archuleta's motion to suppress should have been denied. We reverse the trial court's suppression order and remand this case for further proceedings.

Justice MARTINEZ dissents.

Justice MARTINEZ dissenting:

I respectfully dissent. Initially, it should be noted that I do agree with much of the majority's analysis. I join the majority's conclusion that Archuleta was not seized until the officer chasing him drew a weapon and approached, and I agree that the seizure at this point was an investigatory stop, despite the use of a weapon. I also agree with the majority that a person's evasive actions and presence in a bad neighborhood may be *relevant* to, but are not themselves *sufficient* to establish, reasonable suspicion of criminal activity. However, I cannot join the majority's conclusion that Archuleta's conduct in this case was sufficient to create a reasonable suspicion that a crime was afoot.

The key question in this case is whether the various aspects of Archuleta's evasive

---

**8.** Neither party has raised and we do not here address the question of whether Archuleta's subsequent incriminating statement regarding the

heroin baggies, made prior to the advisement of *Miranda* warnings, was admissible.

behavior after the commencement of the foot chase can combine with his initial act of evasion (fleeing) and his presence in a bad neighborhood to transform a mere hunch by a police officer into the more articulable reasonable suspicion of criminality required by the Fourth Amendment. Because I believe our former cases and the relevant decisions of the United States Supreme Court establish that, even in totality, the circumstances in the record before us do not justify the investigatory detention of a person at gunpoint, I would affirm the trial court's order of suppression.

## I.

The Fourth Amendment to the United States Constitution, and Article II, Section 7 of the Colorado Constitution protect against unreasonable search and seizure. *See Minnesota v. Dickerson,* 508 U.S. 366, 372, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *People v. Salazar,* 964 P.2d 502, 504 (Colo.1998); *People v. Canton,* 951 P.2d 907, 909 (Colo. 1998). A search or seizure made in the absence of a warrant is deemed unreasonable unless justified by an established exception to the Warrant Clause of the Fourth Amendment. *See Salazar,* 964 P.2d at 504; *Canton,* 951 P.2d at 909. Further, an individual may not be subjected to arrest unless there is probable cause to believe that he or she has committed a crime. *See People v. Tate,* 657 P.2d 955, 958 (Colo.1983).

The United States Supreme Court has held, however, that police officers may conduct a brief investigatory stop upon something less than probable cause. *See Terry v. Ohio,* 392 U.S. 1, 26–27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is not probable cause to make an arrest"). Because the investigatory stop doctrine is essentially a limitation on Fourth Amendment rights, it applies only where officers have a "reasonable suspicion" that criminal activity may be afoot. *See id.* at 30, 88 S.Ct. 1868.

An officer's suspicion is "reasonable" when it is based upon "*specific* and articulable

facts which, taken together with *rational* inferences from those facts, reasonably warrant" the belief that a crime has been, is being, or is about to be committed. *Id.* at 21, 88 S.Ct. 1868 (emphasis added); *see United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981); *Salazar,* 964 P.2d at 505 ("reasonable suspicion" inquiry rests on whether specific articulable facts and appropriate inferences, viewed in totality, can "justify the intrusion into the defendant's personal security"). Although there may be circumstances in which "wholly lawful conduct might justify the suspicion that criminal activity is afoot," *United States v. Sokolow,* 490 U.S. 1, 5, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), an officer may not make an investigatory stop based only on an "inchoate and unparticularized suspicion or 'hunch.'" *Terry,* 392 U.S. at 27, 88 S.Ct. 1868; *see People v. Rahming,* 795 P.2d 1338, 1341 (Colo.1990). Instead, there must be a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez,* 449 U.S. at 417–18, 101 S.Ct. 690. The constitutional interest at stake is "far from insignificant: it · is the right of every person to enjoy the use of public streets, buildings, parks and other conveniences without unwarranted interference or harassment by agents of the law." *Rahming,* 795 P.2d at 1340–41.

### A.

Before the reasonable suspicion analysis can come into play, there must be an initial determination of the point at which a Fourth Amendment seizure took place. I agree with the majority that, in this case, Archuleta was seized at the moment Officer Felkins approached him in the El Charrito dining room with his weapon drawn. The majority properly notes that the U.S. Supreme Court decision in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), requires the reevaluation of our decision in *People v. Thomas,* 660 P.2d 1272 (Colo.1983). I agree with the majority's view that *Hodari D.* requires only a limited modification of our precedent, and therefore, our discussion in *Thomas* pertaining to the insufficiency of

reasonable suspicion in that case remains good law. *See* maj. op. at 515.

*Thomas* and *Hodari D.* both involve a defendant's efforts to suppress evidence obtained by the police *after* the commencement of a chase, but *before* the apprehension of the defendant. Thus, these cases involve a distinct and easily recognized fact pattern in which an individual throws away incriminating evidence while fleeing from authorities. Pursuant to *Hodari D.*, a seizure does not take place at the commencement of a foot chase, contrary to our assumption in *Thomas* (a case discussed in more detail below). It is therefore clear that the officers in *Thomas* did not need reasonable suspicion to chase the defendant and seize the discarded evidence. *See People v. T.H.*, 892 P.2d 301, 304 (Colo.1995). As the majority explains, however, *Hodari D.* does not affect our conclusion in *Thomas* that the information known by the officers did not rise to the level of a reasonable suspicion. *See* maj. op. at 515. Thus, the majority explicitly reaffirms the holding of *Thomas* on the issue of what constitutes reasonable suspicion. *See id.* I concur in this expressed adherence to *Thomas*.

Because the majority relies upon *Thomas* and its progeny to explain the constitutional threshold for reasonable suspicion in the investigatory stop context, a discussion of our holdings in those cases is essential.

In *Thomas*, we specifically recognized that police officers cannot rely solely on the furtive gestures of the defendant as the basis for reasonable suspicion. *See Thomas*, 660 P.2d at 1275. Significantly, we did not distinguish between running and other evasive conduct. *See id.* In view of the constitutional interests implicated, we declared it improper to base an investigatory stop on the evasive action alone, explaining:

> It is *only* when a person's effort to avoid police contact is coupled with an officer's *specific knowledge connecting that person to some other action or circumstance indicative of criminal conduct* that the evasive action, *whether running or otherwise*, takes on a sufficiently suspicious character to justify a stop. An officer for example, who sees a person running from the scene

of some *reported or observed criminal activity* would have a specific and articulable basis in fact to stop that person, as would an officer who comes upon evasive action which is linked to other *observed conduct indicative of illegal activity*.

*Id.* at 1275–76 (citations omitted)(emphasis added).

Even where officers observe evasive or secretive behavior in a high-crime area, this court has held that the threshold test for reasonable suspicion is not met without some further specific indicia of criminality. Thus, in *People v. Wilson*, 784 P.2d 325, 326–27 (Colo.1989), we affirmed a suppression order entered in a case involving both deliberate evasion *and* a locale known for criminality. Prior to a sting operation in an area that had been the subject of numerous complaints about drug trafficking, officers warned bystanders against interference with the undercover police operation. *See, id.* at 326. Notwithstanding this warning, one of the bystanders approached and contacted a group of three men who were nearing the area, causing one of the men to turn and run. *See id.* Based on this behavior, the fleeing individual was stopped, and illegal drugs were found on his person. *See id.* We affirmed the trial court's order suppressing the evidence, finding these facts to be "even less supportive of the stop that was conducted than the action of the police officers in *People v. Thomas.*" *Wilson*, 784 P.2d at 327.

We have reached the same conclusion where the evasive behavior is significantly more extensive and police observe the subjects in an area that has specific ties to criminality. In *Rahming*, 795 P.2d at 1341–42, we considered whether officers conducted a constitutionally permissible stop where, upon seeing a police cruiser approach, two individuals took flight and three others hurried to a vehicle and drove away to a convenience store. Even though the initial incident took place in front of an apartment building known to be the residence of several gang leaders, and even though an officer testified that the clothing worn by at least one of the subjects was consistent with that worn by gang members, we concluded that the officers did not have the reasonable sus-

picion necessary to justify the stop. *See id.* Just as furtive gestures, standing alone, are too inchoate to sustain an investigatory stop, "[a] history of past criminal activity in a locality does not justify suspension of the constitutional rights of everyone, or anyone, who may subsequently be in that locality." *Id.* at 1343.

The stop in *Rahming* occurred following evasive behavior that was fairly elaborate: after spotting the police, these individuals not only proceeded to their car at a fast pace, but they also drove away – going down the block, around a corner to another street, and proceeding still further to a convenience store where they were eventually stopped. *See id.* at 1341–42. In evaluating the propriety of the stop, however, we did not attribute any particular significance to the protracted or continued nature of the evasive conduct. To the contrary, we found that "the individuals did nothing to suggest that criminal activity was afoot." *Id.* at 1343. Thus, it is clear that extensive evasion and the criminality of an area are not sufficient, even taken together, to raise a reasonable suspicion under our prior cases enforcing the Fourth Amendment.

The majority reaffirms the precedent discussed above, and reiterates that "the fact that a suspect flees from an officer, standing alone, does not support a reasonable suspicion of criminal activity." Maj. op. at 515. I agree.

### B.

The majority also notes, correctly, that while "such circumstances [as presence in a high-crime area and fleeing from the police] individually cannot constitute reasonable suspicion," they may combine with *"other developments"* to form a sufficient basis for a valid investigatory stop. *Id.* at 515 (emphasis added). Indeed, where officers observe evasive or secretive behavior in a locale notorious for criminality, *and have a specific and independent factual basis to reasonably suspect the sort of criminality for which the subject individual is being stopped,* we have found the constitutional test for reasonable suspicion to be satisfied. *See Canton,* 951 P.2d at 910 (in addition to area with reputa-

tion for drug trafficking and evasive behavior by those at the scene, police observed a large roll of currency in defendant's hand and were acting on tip that defendant and others were engaged in drug activity); *Ratcliff,* 778 P.2d at 1378–79 (in addition to viewing a secretive exchange between two individuals in area prone to criminality, one of the participants was known by officers to be a user and seller of illicit narcotics).

Consequently, in order to find reasonable suspicion present in this case, specific indicia of criminal activity independent from the mere presence in a high-crime area and the evasion of police must be identified. In this regard, the majority breaks the chase down into the various facts it believes to be supportive of a reasonable suspicion. *See* maj. op. at 515. In my view, however, the items enumerated by the majority are either subsumed within the general understanding of "evasion" or merely embody different iterations of the fact that the area was prone to criminality.

While the majority attributes independent significance to (1) the fact that the El Charrito bar had a bad reputation; (2) the fact that Archuleta and two others were "huddled" together in the alley of this bar; and (3) the fact that Archuleta returned to the very same bar following the chase, each factor implicates nothing more articulable than the notion that the El Charrito was known for drug activity, and Archuleta was present there. Therefore, I do not view the majority's point-by-point recitation of the several aspects of the chase involving Archuleta's presence at, departure from, and return to the El Charrito restaurant as adding anything significant to the inquiry. I do not believe that a person who simply returns to his original location after seeking to avoid unwarranted police attention has given officers new information indicative of criminality.

Similarly, the majority separately enumerates (1) Archuleta's initial act of flight; (2) the fact he kept on running; and (3) the fact that he hid under a table once inside the El Charrito. Breaking down the evasive behavior in this fashion, however, does not imbue it

with any more articulable substance than that arising out of the mere fact of evasion itself. Moreover, analyzing the evasive behavior in this disjunctive fashion seems contrary to the reasoning of *Thomas, Rahming* and *Wilson.* In fact, because evasion and the criminal character of a neighborhood can only give rise to a reasonable suspicion when coupled with "other developments," the majority's separate enumeration of the different varieties of evasive behavior in this case draws a distinction that is somewhat illusory. The moment Archuleta took more than a single step in his attempt to avoid police contact, he can said to have "continued his flight," and once he turned the first corner on his way around the block, he can be said to have engaged in "deliberate evasive action." Hiding under a table is but another variety of evasive behavior, and adds nothing articulable to the reasonable suspicion calculus in the absence of some other development which is itself indicative of criminality.

The majority's suggestion that "continued evasive action that escalates beyond a chase can form one element of a basis for reasonable suspicion," maj. op. at 515, is at odds with its earlier recognition that "the fact that a suspect flees from an officer, standing alone, does not support a reasonable suspicion." *Id.* at 515 (citing *Thomas,* 660 P.2d at 1276). As noted above, I find no reason to draw a distinction between mere "evasion" and some "evasion plus more evasion" which can somehow transform the otherwise insufficient information known to the officer (i.e., a mere hunch) into a constitutionally sufficient reasonable suspicion. Significantly, the majority relies upon the 1974 decision in *People v. Martineau,* 185 Colo. 194, 523 P.2d 126 (1974), as support for its analysis in this regard. *Martineau* is problematic, however, because the court there clearly relied upon *post-seizure* information as a retroactive justification for the seizure itself. The *Martineau* court rationalized its holding as follows: "[a]ppellant's flight from the officer's spot-

light at 4 a.m., and his attempt to hide himself, *coupled with the fact that when he was apprehended he was identified as having been in the vicinity of the earlier break-in* ... justified a reasonable inference in the officer's mind that he might have been engaged in criminal conduct." *Id.* at 198, 523 P.2d at 127–28 (emphasis added). To the extent the *Martineau* court relied on post-seizure information, its holding is erroneous and should be disapproved. *See People v. Padgett,* 932 P.2d 810, 816 (Colo.1997) ("[t]he articulable facts which justify the stop must preexist" the seizure). Because there is no indication that the court in *Martineau* would have found reasonable suspicion had it not improperly relied on post-seizure events, that case is of little assistance in the present context.[1]

Even if, as the majority suggests, *Martineau* can be read to allow a finding of reasonable suspicion based only on the evasive conduct (running and hiding) of the defendant there, such an interpretation would be facially inconsistent with our subsequent holding in *Thomas,* and the later decision must control. In either event, the attribution of additional weight to "continued evasion" in assessing the existence of reasonable suspicion does not withstand scrutiny.

Therefore, six of the seven factors listed by the majority merely reiterate Archuleta's evasive behavior and his presence in a bad area. As a result, I do not view these matters as "other developments" supportive of reasonable suspicion. According to *Thomas* and its progeny (cases reaffirmed by the majority), the combination of these six factors did not provide an adequate basis for an investigatory stop.

The majority adds a seventh—presumably dispositive—factor to the analysis of reasonable suspicion in this case. The majority emphasizes the fact that Archuleta allegedly knocked over a bicyclist who was in the doorway of the El Charrito. *See* maj. op. at 516. The majority supposes that this en-

---

1. In addition to its reliance on *Martineau,* the majority rests upon Professor LaFave's treatise. *See* maj. op. at 515 (*citing* 4 LaFave, *Search and Seizure,* § 9.4(f) at 181 (1996)). However, a careful reading of LaFave suggests the treatise does not supply normative support for the posi-

tion advocated by the majority. Instead, it appears that Professor LaFave is merely cataloging the inconsistent and sometimes widely divergent results reached in cases from various jurisdictions.

counter may amount to a third-degree assault on the bicyclist. *See id.* at 516. For a variety of reasons, this circumstance provides scant support for the majority's finding of reasonable suspicion of criminal activity.

First of all, the suggestion that a criminal assault may have occurred was neither proffered by the People at the suppression hearing, nor considered by the trial court in its analysis. There is nothing in the record before us indicating that Officer Felkins followed Archuleta into the restaurant and held him at gunpoint in order to question him about the *bicyclist*. Further, there is no testimony that could objectively lead a reasonable officer to believe "bodily injury," *see* § 18–1–901(c), 6 C.R.S. (1998), had been sustained by the bicyclist as a result of having been "knocked over." While the bicyclist here may have been knocked sprawling to the ground suffering a bodily injury, it is equally possible that he may have been harmlessly knocked off balance.

Because none of the participants below attached any significance to the bicyclist, the record is completely undeveloped on this point. In fact, the single reference to the bicyclist in the testimony occurs during Officer Felkins' description of the chase, when he notes: "[Archuleta] attempted to enter the bar, in the meantime knocking a person over who was on a bicycle at the doorway." There is no other information.

Secondly, the majority does not view the incident as providing the officer with a reasonable suspicion that a criminal assault had taken place. Had the majority so concluded, the subsequent investigatory stop would have been justified on that basis alone. There would have been no need to delve into the multiple aspects of the evasive behavior here or the criminal character of the area in question. Consequently, although there is no doubt that the commission of a crime during flight from police can provide sufficient grounds for an investigatory stop, the majority implicitly concedes that this is not such a case. Indeed, the majority's concession that the bicyclist incident did not amount to criminal assault is the only conclusion the record will bear. During a colloquy with the attorneys at the suppression hearing, the trial court observed: "Here we have a chase, culminating in the defendant being basically stopped at gunpoint with *no intervening evidence of criminal activity*, other than his running from the police." (Emphasis added.)

Accordingly, the majority must view the bicyclist incident as merely another factor in the totality of circumstances which provide reasonable suspicion in this case. Of course, under the teachings of *Thomas, Wilson* and *Rahming*, the majority must regard the bicyclist factor as providing the (heretofore absent) independent indicia of criminal activity necessary for the existence of reasonable suspicion. That is to say, the majority concludes that the bicyclist incident, although so innocuous as to fail to provide even a reasonable suspicion of criminal assault, serves to swing the pendulum toward a finding of a reasonable suspicion of criminal activity. I do not agree.

Simply adding this incident to otherwise legally insufficient considerations does not suffice to establish a reasonable suspicion. The fact that Archuleta apparently knocked over a bicyclist while running from the police demonstrates, at most, that Archuleta was earnest in his attempt to avoid police (although not so earnest as to have committed a crime during the flight). Thus, the bicyclist factor, although separately enumerated by the majority, is yet another expression of the conclusion that Archuleta was avoiding the police. I cannot distinguish this evasion from that which we found insufficient to create reasonable suspicion in *Thomas, Wilson* and *Rahming*.

In my view, Officer Felkins had nothing more than an inchoate and unparticularized hunch that Archuleta and his companions were up to no good. Archuleta's vigorous attempts to avoid the officer may have strengthened this hunch, but the evasive actions were not legally sufficient, on this record, to ripen the officer's gut feeling into the reasonable suspicion demanded by the Fourth Amendment. Officer Felkins had no more articulable indication that a crime "was afoot" at the point he stopped Archuleta at gunpoint than he did at the moment this defendant first took flight.

## II.

In sum, I agree with the majority that a Fourth Amendment seizure did not occur in this case until the officer approached the defendant with his sidearm drawn, and that the seizure here was in the nature of an investigatory stop. I would find on this record, however, that the observations made and the information known by this officer were insufficient to sustain such a stop. Without more, Archuleta's evasion and his presence in a bad part of town simply could not meet the constitutional threshold for reasonable suspicion. This is true whether the focus is on evasion in general, or on the sum of the individual evasive aspects of the flight in this case. In the absence of a more articulable and concrete basis for suspecting true criminal activity, "the balance between the public interest and [a person's] right to personal security and privacy tilts in favor of freedom from police interference." *Brown v. Texas*, 443 U.S. 47, 51–52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). Such a limitation is necessary "to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Id.* at 51, 99 S.Ct. 2637.

I would affirm the trial court's order of suppression.